WILLIAM SACKER *vs.* COLUMBUS WADDELL.

*Liability of Owner of Wagon for Negligence of His Driver While Employed by a Third Party—When Driver Becomes Servant of Hirer so as to Relieve Owner from Liability for His Negligence.*

The presumption is that when one furnishes a wagon or carriage and the driver for the service of a hirer the driver remains the servant of the owner, and the owner and not the hirer is liable for injuries caused to third parties by the negligence of the driver.

The fact that the team and driver are furnished gratuitously does not relieve the owner from liability for the driver's negligence in the service of the borrower.

But a master may hire or loan his wagon and driver to another for some special service, under the direction of the latter, in such manner that

the driver, as to that particular service, becomes the servant of the hirer.

When the facts are such as to make it doubtful whether the relation of master and servant continued between the driver and the owner of the wagon while in the particular service of a hirer during which the driver's negligence caused an injury, then it becomes a question for the jury to determine whether the driver was acting at the time as the servant of the owner or of the hirer.

Defendant sent his son with a wagon to render gratuitous assistance to his neighbor, Johnson, in harvesting the latter's wheat. While employed in the field the wagon was negligently driven over plaintiff's son causing the injury on account of which this action was brought. The testimony left it doubtful whether Johnson had so acted as to create the relation of master and servant between himself and defendant's son, or whether the latter remained defendant's servant. *Held*, that it should be left to the jury to determine whether the relation of master and servant existed between the defendant and his son as to the particular service during the performance of which the injury was caused.

Appeal from the Circuit Court for Dorchester County (LLOYD, J.)

The cause was submitted to the Court on briefs by:

*Harrington & Mace, Clement Sullivane* and *W. Laird Henry*, for the appellant.

There have been many fine distinctions drawn, and many contradictory decisions have been arrived at in the various Courts upon this point as to whether the boy, Frederick Waddell, on the occasion in question was in the employment of his father, the appellee, or of Samuel Johnson, and upon this Court's view of that single point the result of this appeal must rest. The question has never been passed on in this Court. According to a summary of the whole matter to be found in the case of *Hardy* v. *Spedden & Co.*, 37 L. R. A. 70, it would seem to be fairly well settled that the appellant's view of this case is correct.

It is the universal custom in the exchange of help between farmers, as in this case, that the team sent by one farmer to aid another is in the charge, supervision and control of the driver sent by the owner of said team, and that while the

direction as to the particular wheat to be hauled, in this case, belongs to the owner of the farm, nevertheless, the management and control of the team while being driven was as absolutely under the entire management of the driver sent by the owner thereof as in the case of any team hired from a livery with a driver to accompany the team.

How far to go and when to stop would be under the control of the hirer, but the manner of driving and management of the team would be absolutely under the authority and control of the driver sent by the owner of the team. See *Michael* v. *Stanton*, 3 Hun. 462; *New York, L. E. & W. R. Co.* v. *Steinbrenner*, 47 N. J. L. 161, 54 Am. Rep. 126; *Quim* v. *Complete Electric Constr. Co.*, 46 Fed. Rep. 506; *Hershberger* v. *Lynch* (1887) Pa., 10 Cent. Rep. 389; *Joslin* v. *Grand Rapids Ice Co.* (1883), 50 Mich. 516, 45 Am. Rep. 54. (All referred to on page 73 of L. R. A., vol. 37.)

Frederick Waddell was sent with the team and in charge thereof and as the driver of said team was in the service of his father, and had he been other than a son would have been not only in the service but pay of the father, Columbus Waddell. Frederick being then under his pay and direction, Columbus Waddell at any time could have changed or ended the nature of his service, could have ordered the driver and team home or to any other spot of service he desired. Had the team been damaged by the gross negligence of Frederick Waddell, could Samuel Johnson, under any circumstances, have been held responsible for the damage done? We think not. The relation of master and servant did not exist between Samuel Johnson and Frederick Waddell. Young Waddell drove his father's team, knew what was the return service required, began of his own accord and according to Samuel Johnson never exchanged a word with him during the whole day. The only direction given him by any one being by one Gambrill, who called out to him to "to hurry up." He left and went home carrying the team with him before the work was done without saying a word to Samuel Johnson, upon whose farm the wheat was being threshed.

As to negligence, on unloading his wagon at the star shown on plot, he turned his horse and drove straight down past the thresher, attachment and engine with his horse under whip and without looking at all in the direction in which he was driving and ran over Claude Sacker, who was in plain view if he had looked, and standing in a position behind the wood within three to eight feet of the engine. Both wheels of the wagon went over the wood and over Claude Sacker. According to Frederick Waddell's own testimony he was within two feet of Claude Sacker when he saw him. With his horse in a trot, it was too late then for any warning.

*Jas. W. Waddell* and *John R. Pattison*, for the appellee.

From the undisputed evidence in this case, the appellee, defendant below, contends that the relation of master and servant did not exist between the defendant and his infant son, Frederick Waddell, at the time of the alleged injury to the plaintiff's son, complained of. That the services of the younger Waddell were, by his father, loaned unto the said Samuel Johnson, and that such services were, for the time, at the disposal of the said Samuel Johnson, and that he, the said Frederick Waddell, was, for the time for which his services were loaned and at the time of said alleged injury to the plaintiff's son, the servant of the said Samuel Johnson, and under his management, control and direction, and not under that of the defendant. That there is nothing in the evidence to warrant the conclusion that Frederick Waddell was to perform any specific services in aiding Samuel Johnson in threshing his wheat. Samuel Johnson was told by the defendant that he could only send him a single team in return for help previously furnished him by Samuel Johnson, and that "*Fred might go.*" There was nothing said to indicate that Fred Waddell should, upon his arrival at the premises of Samuel Johnson, take charge of, drive and use said horse and wagon in hauling said wheat from the field to the thresher, or that he should drive and use said horse and wagon for any purpose in connection with the threshing of said wheat. The defendant loaned and

furnished to Samuel Johnson, not only a horse and wagon, but also the services of his infant son.   The horse and wagon to be used in connection with the threshing of Samuel Johnson's wheat as he, Johnson, should determine.   Johnson was not restricted in the use of said team to the hauling of the un-threshed wheat from the field to the thresher.   He could have used it in hauling the threshed wheat from the thresher or in hauling wood or water to and for the use of the engine as well as for the use to which it was applied.

Not only could Johnson, under said loan, have used said horse and wagon for any of the purposes aforesaid, but he also, from the character of the loan, could have placed any person whatever in charge of said team to manage and drive it for such purposes as he might select, provided the same was used in connection with the threshing of said wheat.   There was nothing said by the defendant, in lending to Samuel John-son the horse and wagon and the services of his son, from which it could be inferred that this team, when upon the premises of Johnson, should be managed and driven by young Waddell and no one else.   It was with Samuel Johnson, in the absence of any specific directions from the defendant as to how the property so loaned by him, the defendant, to the said Johnson, should be used, to determine for what purpose it should be used in connection with the threshing of said wheat.   It was likewise with Johnson to determine to what work he should assign young Waddell in the absence of any specific directions from the father.   Young Waddell explained fully why he started to haul wheat.   It was because, to reach the thresher, from his home, the shortest route was through the wheat field, and he, in passing through said field, of his own volition, and without directions from anyone assisted in loading the wagon and carried it so loaded to the thresher. He shortly thereafter, however, sees Samuel Johnson, and complains to him of the weight of his work and asks that some other work be given him, thus clearly showing that he recognized in Johnson the right to designate what work he should perform and to manage, control and direct him therein.

And Johnson from his reply to said request likewise clearly shows that he too considered that he had the right to name the work to be done by young Waddell and to control, manage and direct him as to the same.    Independent of these acts, strongly showing in whom the right was lodged to control, manage and direct the work of the defendant's son, we find from the evidence that Gambrill, the field manager of Samuel Johnson, was, immediately preceding the accident directing and controlling the movements of Frederick Waddell in the performace of his work.    The defendant was ignorant of the work to which his son had been assigned, was not upon the premises at the time of the accident, nor was he upon the premises of Johnson at any time during the day, but, as stated in the evidence, was at his home, several miles away. This is not one of those cases where an owner of a chattel, for a consideration, and not as a loan, places it at the disposal of another, to be in the charge, however, of owner's servant, and to be conducted, managed and operated by such servant in a given kind of work; and the law applicable to such cases is not applicable to this.

The appellee further contends that had the relation of master and servant actually existed, between the defendant and his infant son, Fred. Waddell, at the time of the alleged injury to plaintiff's son, even then the action of the Court in granting said prayer was right and proper, in as much as there was no legally sufficient evidence upon which they could find for the plaintiff.

BOYD, J., delivered the opinion of the Court.

The appellant sued the appellee for the loss of services of his son, who was about ten years of age, and for money expended by him for injuries sustained by the son by reason of the alleged negligence of the infant son of the appellee "employed and engaged in driving a wagon upon said defendant's business."    Samuel Johnson assisted Waddell, the appellee, in threshing his wheat by furnishing him two men, a wagon and two horses, and he notified him when he would thresh his own

wheat and requested a return of help.   Waddell said that he could only send him a single team and "Fred might go, and Johnson replied that it was all right."   At the appointed time the appellee sent his son Frederick, who was about fifteen years of age, with his horse and wagon to Johnson's.   Frederick drove to the wheat field and before reaching the thresher stopped in the field and got a load of wheat, which he carried from where it was stacked to the thresher, "without any instructions from Johnson or any one else."   The length of the thresher, attachment and engine, was about sixty feet.   A man named Gambrill was in charge of the work for Johnson, and Claude Sacker, the appellant's son, who was visiting Joseph Johnson, a brother of Samuel, went of his own accord with Joseph and others who were to help Samuel.   After Frederick had taken one or two loads to the thresher, he hauled another, which he had unloaded, and as he was about to return to the stacks Gambrill called him to come to him, and looking towards Gambrill, who was standing in the field some distance from the thresher, he drove past the thresher, attachment and engine and in doing so ran over Claude Sacker, who was standing by a pile of wood near the engine. Frederick did not see Claude until his horse was within a few feet of him, when he called to him to "look out" and tried to check the horse, but Claude in the confusion took a step backwards and the wagon ran over him.   There was some conflict between the witnesses as to the speed of the horse, but that is not very material as the case is presented to us.   At the conclusion of the testimony the Court granted a prayer that there was no legally sufficient evidence to entitle the plaintiff to recover, and instructed the jury to find for the defendant. It is said that action of the Court was based on the theory that at the time of the accident the relation of master and servant did not exist between the appellee and his son, but the latter was then the servant of Samuel Johnson and under his control and direction.   It is suggested in the brief for the appellee that independent of that question the prayer was properly granted, as there was no legally sufficient evidence upon

which the jury could have found for the plaintiff, but without repeating the testimony, we are of the opinion that there was sufficient evidence of negligence to require the Court to submit it to the jury, if the appellee was responsible for the negligence of Frederick at the time of the injury, and hence we must consider that question.

The precise point now presented has not heretofore been decided by this Court, although there have been many cases before us and our predecessors involving the responsibility of masters to third persons by reason of the alleged negligence of their servants. In *Deford* v. *State, use of Keyser*, 30 Md. 179, the principle recognizing the distinction between cases in which the relation of master and servant existed and those in which there were independent contractors was fully adopted, and has since been followed. But the question here is whether the facts proven so establish the relation of master and servant, between the appellee and his son in reference to the work at which the latter was engaged, as to make the former responsible for the alleged negligence of the latter, which resulted in the injury of young Sacker. The case of *Laugher* v. *Pointer*, 5 B. & C. 547, left the law in doubt in England (the four judges being equally divided) as to whether the owner of a carriage drawn by horses owned by a job-man, who also supplied the coachman, was responsible for an injury sustained in a collision. The job-man did not pay the coachman for that day and the defendant did, but it was paid as a gratuity and not in pursuance of any contract, the coachman having no employment by the defendant, excepting such as might be inferred from his driving the carriage on that day. In *Quarman* v. *Burnett*, 6 Mee. & Wels. 499, which, as was stated in Deford's case "is regarded as a leading case and the one in which the present approved doctrine was first definitely established," the opinions of ABBOTT, C. J., and LITTLEDALE, J., in *Laugher* v. *Pointer*, were approved and the defendant was held not to be liable, although there were some facts which strengthened the case against the hirer. In the exhaustive notes to the case of *Hardy* v. *Shedden*, 37 L. R. A. 1, it is said, on page 71,

that the theory "which is now established by an overwhelming weight of authority, is that a servant sent to take charge of a chattel owned by his master, while it is placed at the disposal of another party for the performance of a given piece of work, is presumed to remain the servant of his general employer, and that some special circumstances apart from the mere fact of the hiring of the chattel must be put in evidence in order to overcome this presumption. The leading cases upon this doctrine are those known as the 'carriage cases.'" Among other cases in which it has been held that the owner, and not the hirer of the team, when the owner also furnishes the driver, is liable for the injuries to third persons caused by the negligence of the drivers, are *Joslin* v. *Grand Rapids Ice Co.*, 50 Mich. 516; *Crockett* v. *Calvert*, 8 Ind. 127; *New York, etc., R. Co.* v. *Steinbrenner*, 47 N. J. L. 161; *Fenner* v. *Cripps*, 109 Iowa, 455, and *Huff* v. *Ford*, 126 Mass. 24. The principle announced in those cases is recognized in *P., W. & B. R. R. Co.* v. *Hogeland*, 66 Md. 149, where it was held that the contributory negligence of the driver of a vehicle not owned or controlled by the passenger, will not constitute a bar to the right of the passenger to recover for injuries received by a collision of a train of the railroad company with the vehicle. Nor does the fact that the team and driver are furnished gratuitiously of itself relieve the owner of the negligence of the driver. *Muse* v. *Stern*, 82 Va. 33; *Michael* v. *Stanton*, 3 Hun. 462; *Donovan* v. *Laing W. & D. Constr. Syndicate* (1893), 1 Q. B. 629.

Although we are of the opinion that the law applicable to such cases is now well established to be as above stated, there may of course be circumstances which would relieve a master for injuries sustained by reason of the negligence of one who is in his general employ. The master may so hire or loan his servant to another for some special service, as that he will, as to that particular service, become the servant of such third person. If the master has parted with all power of control over the servant and permits the third person to make such use of him as he may deem proper, he may *quoad* that serv-

ice, be the servant of the third person, and not of the general master. In this case the appellee said he could only send Johnson a single team and "Fred might go." He accordingly sent his son with the horse and wagon to Johnson to help him in threshing his wheat, and as stated in the record "Frederick drove said horse and wagon over to Samuel Johnson's wheat field where the wheat thresher was then at work, and before reaching the thresher Fred stopped in the field and carried a load of Johnson's wheat from where it was stacked in the field to the thresher, without any instructions from Johnson or any one else." The defendant also offered evidence tending to show that after his son "had carried a load or two he went to Johnson and said the work was too heavy for him and asked if he couldn't do something else. In reply Johnson told him to try it a while longer anyway, when he would find him something else to do. Subsequently in the afternoon, while returning for another load, the accident happened." In rebuttal Samuel Johnson testified that he might or might not have had such conversation with Fred, but he could not recollect whether he had. The testimony in the record is rather meagre as reflecting on the question whether Fred was in fact the servant of his father, so as to make the latter responsible for the alleged negligence of the son, or whether Johnson, or his manager, so acted as to create the relation of master and servant between him and Fred in such way as to relieve the appellee. When the facts are such as to make it doubtful whether the relation between the servant and the original master continued for the particular service during which the accident happened, it is usually a question for the jury to determine. It is said in 2 *Thomp. on Negligence*, p. 899, "Whether the person whose immediate negligence or misconduct caused the particular injury was acting at the time as the servant of the person sought to be charged frequently depends upon such a variety of facts that it falls outside of any definite rule and for that reason becomes, under proper instructions, a question of fact for the jury." See also *Kimball* v. *Cushman*, 103 Mass. 194; *Crockett* v. *Calvert*, 8 Ind.

127; *Larkin* v. *Burlington, C. R. & N. Ry. Co.*, 85 Iowa, 499. In *Deford's case, supra,* the Court said "The greatest difficulty, however, in these cases is in determining, upon the facts, who is to be regarded as the master of the wrongdoer. This of course depends mainly upon the terms and character of the contract of employment. * * * The terms and manner of employment were, of course, matters of fact for the jury, it being for the Court to declare the legal relation that existed between the parties, upon any given state of facts."

So without citing other authorities it would seem to be clear that when there is any real question, under the testimony, as to whether the relation of master and servant did exist between the negligent servant and the one sought to be held as master, as to the particular service in which the injury was sustained, it should be submitted to the jury. In this case the record does not present such clear facts as justified the Court in determining, as a matter of law, whether such relation did exist, and that question should have been submitted to the jury. For error in granting the prayer referred to, the judgment must be reversed.

*Judgment reversed and new trial awarded,*
*the appellee to pay the costs.*

(Decided December 3rd, 1903.)