STATE, FOR THE USE OF ANNA CHIMA, *v.* UNITED RAILWAYS & ELECTRIC COMPANY.

[No. 36, January Term, 1932.]

*Decided April 15th, 1932.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Harry J. Green,* with whom were *Abraham Davidson* and *Weinberg & Sweeten* on the brief, for the appellant.

*James J. Lindsay, Jr.,* with whom was *Philip S. Ball* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

This appeal is from a judgment for the defendant, the United Railways & Electric Company of Baltimore, appellee, rendered in an action brought against it by the State of Maryland, for the use of Anna Chima, the appellant, to recover for the loss sustained by her in the death of her son, Theodore B. Dan, caused, as alleged, by the negligence of the defendant.

It was alleged in the declaration that Theodore B. Dan, "on or about the first day of June, 1930, while the said Dan was a passenger on a street car belonging to the defendant, and operated by the defendant, its agents, servants and employees, in an unlawful, negligent and careless manner and at a high rate of speed over the tracks belonging to the said defendant, which tracks were maintained by the said defendant in a negligent and careless manner, he was, without any negligence on his part contributing thereto struck and knocked down when the said street car violently careened and swerved on the said tracks; that in consequence thereof the said Theodore B. Dan then and there sustained injuries of such a serious character that he died; and that said wrongful acts, neglect or default on the part of the defendant, its agents, servants and employees, were such as would, if death had not ensued, have entitled the said Theodore B. Dan to maintain an action against the said defendant to recover damages in respect thereof."

The conceded facts of the case were these: Theodore B. Dan, nineteen years old, with four others, Wilbur Clark, Carl Martin, John Martin, and William Louder, boys of his age, planned to visit the Esssex skating rink near the City of Baltimore on the evening of June 1st, 1930. They were to meet at Fifteenth Street and Eastern Avenue at 7 o'clock,

and ride with Louder in his automobile to Essex. Louder failed to meet the others at the appointed place and time, and after waiting for him until 7.15 o'clock, they decided to take the Eastern Avenue car to Essex. Wilbur Clark and Carl Martin sat in the second seat from the front on the right side of the car. The car was going east. John Martin sat on the front longitudinal seat on the left of the car, while Dan sat alone in the second seat on the left side, next to the window.

Louder, upon reaching Fifteenth Street and Eastern Avenue, and learning that the other boys had gone on the street car, drove down Eastern Avenue until he overtook the car. The road on which Louder was driving was on the north side of the westbound car track. When he reached the car, he blew his horn, which was heard by those in the car, and Dan, who was seated on the side of the car next to the road on which Louder was driving, looked around and saw him in his automobile. The boys seated on the far side of the car also saw Louder, and they called and waved to each other.

The windows of the car were up. To prevent persons from putting their arms or heads out of the window, an iron screen, eighteen inches in height from the sill, was placed upon the outside of the window. Between the top of the screen and the bottom of the raised window, there was an opening of sixteen and one-quarter inches. In the car there was posted the warning: "Keep your Head and Arms inside of Car."

The accident occurred near the intersection of Southern and Eastern Avenues, when the car was moving up grade. Prior thereto, it had been on a down grade of one per cent., for a short distance. In the dummy track, that is, the space between the east and westbound tracks, were poles used in connection with the operation of the cars. These were located near the north rail of the eastbound track, and on the side of the car on which Dan was seated. One of the poles was near or at the place where the accident occurred.

The evidence of the plaintiff and defendant differs as to how the accident happened. Upon this question the plain-

tiff's evidence is confined to that of Dan's associates in the car, and Louder in his automobile near the car.

Wilbur Clark, who was seated on the right side of the car, next to the aisle, testified that his attention was attracted to Louder's presence in his automobile by the blowing of his horn, and looking around, he saw the automobile alongside of the street car. "He saw Theodore start to get up, knowing they wanted to get off at the next stop, that is, North Point Road. The car was then just making the grade, just going up the hill at the curve when the car made a sudden curve. * * * The next thing we saw and heard his (Dan's) head hit something, and we saw his cap fly across the car and he had slumped in his seat."

Carl Martin testified that he could not really see Theodore Dan because "Bill (Clark) was in his way, sitting alongside of him. He did not see Theodore Dan do anything. The first he knew that anything had happened was when he heard a dull thud and happened to look over that way and saw Theodore slumped in his seat." He further testified that the car, until it reached the hill at Oak Lawn Cemetery, had been going about twenty-five miles an hour. Thereafter it started to gather speed and "started swaying"; that is "it was just going from side to side." This down grade extended about the length of two blocks, and then the car started "up a short grade and at the top there is a sharp turn to the left. At that curve, or approaching it, the street car made a sudden lurch." He took note of this because, as he said, "Bill (Clark) had slammed against him and nearly was thrown out in the aisle. It was almost at the same time that he heard the thump."

John Martin testified that when he heard the horn blow he saw Bill Louder, and he said to Theodore, " 'There is Bill now, we had better get off' and Bill motioned to him to get off at the next stop. * * * He (Dan) raised to push the bell, but he did not get that far. * * * His hat blew off, and he swung around to catch his hat and he fell against the standard pole." He also testified that the car was "going pretty fast and when it reached the top of the grade it was going so fast

that the straps were hitting the side of the car, but the car lurched right before that."

Louder, who was in his automobile, testified that when he caught up with the street car and came alongside of it, he "blew his horn and attracted John Martin's attention. * * * John turned around * * * and he motioned to John to get off and John just waved back to him." They went along a little further and Theodore, who was in the seat behind John, "started to rise in the seat and it appeared to him that Theodore's hat blew off or Theodore turned around and reached for it and then slumped down in his seat." He was sure that Theodore had not stuck his head out of the window.

There were a number of passengers in the car at the time of the accident. Among them was one, Emic C. Raum, who was seated in the third seat on the right side of the car. He testified that an automobile came up the road, "a roadster, with the top down, with the horn honking, and everybody seemed to be looking at the machine. There was a boy sitting in the seat right in front of him on the other side and this boy got up and waved his hands. The other fellow kept waving his hand at the boy. This was the boy who was afterwards hurt. * * * The fellow in the machine was * * * hollering at the boys in the car. There was a couple of other boys up in the front of the car also hollering." Raum was asked what happened then, and he replied: "Well, this boy, he gets up, and he waves to him and sticks his head out of the car over top of the rail, and there is a screen on the car so you could not stick your arms there, and he stuck his head over and a pole hit him and he fell right back in the car and sit there, and I picked him up." This witness got on the car at Fairmount Avenue and Wolfe Street, and he testified further, that, "as the car got to where the accident occurred, it was going at a regular rate of speed. * * * The car was not being operated faster than usual, it was going at a moderate rate of speed. It was not going faster because it was going uphill at the time, just getting ready to make the curve. * * * At the time the accident occurred, there was

no unnecessary swaying. * * * The noise was sort of a thud. * * * He did not feel any lurch."

Joseph A. Calder, likewise a passenger on the car, testified that, when the roadster pulled up, the driver of the automobile "called to this young gentleman in the front and waved, and the young gentleman in front who was killed did the same. That is what called his attention to them. * * * When the street car hit the curve, Dan got up and looked out. There is a wooden pole there and it struck Dan a glancing blow and Dan fell in on the seat. * * * The street car was running from eighteen to twenty mile an hour * * * was not swaying from side to side," and it "was not jostling him around in the seat one bit."

Gertrude I. Hughes, another passenger, was seated on the right-hand side of the car about three seats from the front. She observed all the boys; there were several boys together, three or four sitting in front of her, and the one injured was seated on the left-hand side of the car alone. "The boys were having a good time, laughing and joking and waving at girls as they went by, having a good time in general." While this was going on, some one came up in an automobile. The driver blew his horn, "and all of a sudden this boy, sitting by himself, without a moment's warning, jumped up and leaned out of the car. * * * She heard the thud and he slumped right down. * * * She pressed the button, and the car came to an immediate stop."

Andrew Fedder, the motorman, testified saying: "Prior to getting a signal to stop, the machine was going along with the car sixty-five or seventy-five yards alongside of the car. The driver was waving his hand. He did not pay any attention to the auto at that time because he was going down grade and was afraid something would come out in front of him. * * * At about the time he noticed the automobile, he was going between ten and fifteen miles. It is only a little grade about twenty-five yards long and then a level place about twenty-five yards long between the two hills, then he was coming into a curve. The curve is about fifteen yards long from the time you hit the upgrade until you get up on

the level. He did not notice any swaying or lurching in any unusual manner. He was on time that night." After stopping the car, the motorman "looked behind and saw some fellows helping another fellow. He asked what was the matter and that boy there (indicating) said: 'He just got struck with a pole, he stuck his head out of the window.'" The name of the boy who said this was not mentioned at this time.

The motorman did not know "where the accident occurred. He never heard a horn blowing. The first thing he knew some one gave him a bell and he figured somebody wanted to get off at Southern Avenue. Southern Avenue is around the curve. * * * The curve is not a real sharp curve, it is about medium. * * * He was going about fifteen miles an hour down grade and when he was coming to the other grade, he was putting air on and checking his car down to about nine miles an hour. Coming into the curve, he commenced applying the brakes."

J. H. Yanda, the conductor of the car, testified that he noticed the automobile as it came up beside the car, and that the boys in the car commenced to call and wave to the driver of the automobile. At this time his attention was withdrawn from the automobile by one of the passengers in the car, who had asked him a question, and when he looked again he saw "Theodore Dan lying back in the seat." He went to him, somebody in the meantime pulling the bell, and asked: "What is the matter?" In his testimony the conductor then stated: "One of the boys standing in the front of the car, Johnny Martin, said: 'He stuck his head out of the window.'" This statement, however, was denied by Johnny Martin. The conductor then helped to remove Theodore Dan from the car and place him in the automobile. He further testified that "the street car was just climbing a hill about twelve miles an hour and cut out to hit the curve. Just as we hit the curve his attention was attracted to Dan. The street car was not swaying or lurching immediately before that time. * * * The speed had not yet been reduced to nine (miles an hour).

It was reduced after they hit the curve. The motorman had to slow down to hit the curve."

Henry A. Lounge, another passenger on the car, was going down to the shore with a lady friend. His testimony was as follows: "The first he observed was after Theodore Dan got hit and was sitting in the seat slumped back. * * * The car was not going very fast. * * * He did not notice that the car was swaying or lurching more than usual."

In the trial of the case fifteen exceptions were taken to the rulings of the court upon the evidence, and one upon its rulings on the prayers. The plaintiff offered four prayers, all of which were granted. The defendant asked for seven instructions; of these four were granted and three refused. Those refused were prayers directing a verdict for the defendant.

It is argued by the appellant that the first prayer of the appellee is inconsistent with her second prayer, and for that reason the first prayer of the appellee should not have been granted.

The jury were told by the plaintiff's second prayer that, if they found from the evidence "that the injury and death of Theodore B. Dan were caused through some instrumentality in the control of the defendant, or the management or operation thereof, whilst a passenger on one of the defendant's cars, the fact of such injury and death is *prima facie* evidence of negligence on the part of the defendant and casts upon it the burden of rebutting this presumption by showing there was no negligence on its part." By the defendant's first prayer, the jury were told that "the mere happening of the accident raises no presumption of negligence on the part of the defendant but the burden is upon the equitable plaintiff to establish such negligence by a fair preponderance of affirmative evidence, and if the minds of the jury are left in a state of even balance as to the existence of such negligence on the part of the defendant then the verdict of the jury shall be for the defendant."

This prayer is the ordinary instruction usually granted the

defendant as to the burden of establishing the negligence with which the defendant is charged.

The mere fact that the plaintiff was injured while a passenger on the defendant's car does not, of itself, raise a presumption of negligence, in the absence of surrounding circumstances from which a legitimate inference of negligence can be drawn. *Benedick v. Potts,* 88 Md. 55, 40 A. 1067; *Western Maryland Railroad Co. v. Shirk,* 95 Md. 652, 53 A. 969; *Charles v. United Railways Co.,* 101 Md. 183, 60 A. 249. See *Callis v. United Rys. & Elec. Co.,* 128 Md. 411, 97 A. 715, 716. There are cases, however, where the proof of the injury, under certain circumstances, raises a presumption of negligence on the part of the carrier; for instance, where the passenger "is injured by the breaking down or upsetting of the vehicle used in the transportation, or by colliding of one train with another, or by the train running off the track, from some defect in the road-bed, in these and in other like cases, the evidentiary facts in themselves create a presumption of negligence on the part of the carrier." *Balto. & O. R. Co. v. State, use of Mahone,* 63 Md. 144. It would seem that the trial court, in granting the plaintiff's second prayer, treated the instant case as falling within the class of cases just mentioned. In so treating the case, the court, we think, erred, and the plaintiff's second prayer should not have been granted.

The act of negligence in this case imputed to the defendant is that the car swayed from side to side or made a sudden lurch, caused, as alleged, by the condition of the tracks, or by the speed with which the car was operated, resulting in the plaintiff's head striking either a pole on the side of the track, or some part of the car itself, producing the injury which caused his death.

In *United Rwys. & Elec. Co. v. Phillips,* 129 Md. 328, 99 A. 355, 356, the plaintiff entered the car, and while standing between the seats, the car started with an unusual and sudden jerk, throwing the plaintiff violently to the floor on her knees, thereby causing the injury complained of. Speaking through Judge Burke, this court said: "In any case where

it is alleged that a carrier has failed to discharge its duty to its passenger, the special facts and circumstances of each particular case must be carefully considered. The authorities are quite uniform in holding that no fixed rule can be laid down as to what jerking, lurching, or swaying of the car will give rise to on inference of negligence in its management. But we think, both upon reason and authority, a sudden jerk of such unusual severity as that described in the evidence and manifested by its results is sufficient to raise a presumption of negligence on the part of the defendant. * * * In *Callis v. United Rwys. & Elec. Co.,* 128 Md. 406, where the plaintiff was standing upon the steps of a moving electric car and was thrown therefrom by a movement of the car which was described as 'just a sudden jerking forward,' it was held that such a movement did not give rise to an inference of negligence." The court, "in commenting upon the facts in evidence" in that case, said: " 'It is not disclosed by the record that such forward movement of the car was anything more than the ordinary and usual motion incident to the running of electric cars, and as such it does not as an evidentiary fact in itself create a presumption of negligence on the part of the defendant carrier. A sudden jolt or jerking forward of the car, as the plaintiff describes it, not unusual or extraordinary, is no evidence of negligence on the part of the defendant company.' The jerk or lurch of the car as described by the plaintiff in this case (*United Rwys. & Elec. Co. v. Phillips*), judged by its results upon her and upon the other passengers, and apart from the adjectives used by her in describing it, shows it to have been of an unusual and extraordinary character, and so out of the ordinary as to suggest negligence in the management or control of the particular car."

The evidence in this case does not show any unusual or extraordinary movement of the car. In speaking of this movement, Wilbur Clark said: "The car was then just making the grade, just going up the hill at the curve when the car made a sudden curve." Carl Martin testified: "At that curve, or approaching it, the street car made a sudden lurch."

John Martin's testimony included the statement, "The car lurched." There is no testimony that the lurch or movement of the car was unusual or extraordinary. On the contrary, the evidence of the passengers in the car, other than the companions of the decedent, as well as of the motorman and conductor, was to the effect that, at the time of the accident, there was no unusual or extraordinary movement of the car, nor was the car going unusually fast.

If the instructions granted by the second prayer of the plaintiff and the first prayer of the defendant are inconsistent, it arises from the wrongful granting of the plaintiff's second prayer, and there is no reversible error because of such inconsistency.

The plaintiff especially excepted to the defendant's fourth prayer, upon the ground that there was no evidence tending to show that the decedent put his head out of the window of the car. There is in the record evidence tending to show this fact, and the special exception was properly overruled.

In the first exception relating to the testimony, a witness produced by the plaintiff was asked: "Will you look at this second photograph and tell us what it shows? A. The same thing all the way through; only the tracks were in bad condition." In the third exception, Louder, the driver of the automobile, was asked: "Did you notice anything about its (the car's) movements at that time, just about the time this thing happened? A. It seems to me, all the cars I have ever seen travel along there pretty rough, it seems to be a rough stretch of tracks along there." To each of these answers objections were made and sustained by the court. In the thirteenth exception, Joseph Ponzella, a section foreman on the defendant's railway, who had supervision over its tracks, was asked by the court: "Just answer this one question, the jury wants to know, was that track at the point of that accident at the time of the accident in safe and sound condition or not?" Objection was made thereto by the plaintiff's counsel. The objection was overruled and the witness answered: "In sound condition." In the fourteenth exception, plaintiff's counsel asked this witness: "Suppose I told you, assuming

it for a fact for the time being, that within two or three days of this accident you could go down there and just pull the spikes out with your own hands, lift them out from those rails, would that be good condition?" This question was objected to, and the objection sustained.

We discover no error, certainly no reversible error, in any of these rulings.

The photograph involved in the first exception had never been offered in evidence, and it had not been shown that it was the correct representation of the track at the time of the accident, or that the witness had made any examination of the road, or was any more competent to speak of its condition as it appeared from the photograph than the jury.

The answer of the witness in the third exception that the travel was "pretty rough" at the point of the accident had little or no probative force, as he had previously testified that he was not familiar with the neighborhood; and whatever impression he got as to the roughness of the travel was acquired by him while driving his automobile on the road alongside of the car. If this question was admissible, the exclusion of it could not be held a reversible error.

The answer of the witness to the court's inquiry as to the condition of the road in the thirteenth exception, saying that it was in good condition, was after the witness had been examined in detail by the plaintiff's counsel upon the condition of the road in an attempt to show that the road was in bad condition. We do not discover that the court erred in the admission of this evidence, and the same may be said of the fourteenth exception.

The fourth exception is not argued, and we may assume that it was waived, though we find no error in the court's rulings thereon.

In the fifth exception, the witness, a passenger on the car, testified on cross-examination that he frequently went to the shore on North Creek on the street cars, that he was a married man, although his wife was not with him on that occasion. He was to meet some friends of his, and, when asked who they were, he said a couple of fellows and girls. He

was again asked who they were, and, upon objection being made to this question, the court excluded it, holding that the information sought was unnecessary. We find no error in the court's rulings on this exception.

The sixth exception was to the question: "Did you take your wife with you?" Upon objection this question, too, was excluded, we think properly so, for he had already stated that his wife was not with him on that occasion.

In the seventh exception, Fedder, the motorman, was asked on cross-examination to look at a photograph and say whether or not he recognized a certain location. He replied: "What do you mean, the location where the accident happened?" The counsel for the plaintiff said: "Yes." Witness then answered: "I don't know where the accident happened." He had previously testified to the same effect. The use of the photograph was objected to for the purposes of the inquiry, and the objection was sustained. We find no error in the court's rulings upon this exception. And the same may be said of the eighth, ninth, and tenth exceptions. Exceptions eleven and twelve were not pressed.

This leaves only the second exception to the evidence to be considered and passed upon. In this exception, the appellant's counsel asked to install in the courtroom a moving picture apparatus so that he might exhibit on the screen a picture of a car in motion on the track at or near the point of the accident, but was not permitted to do so. The picture of the car which he wished to exhibit was not a picture of the car in which the decedent was a passenger at the time of the accident, but a picture of a car subsequently taken. As stated by the counsel, this evidence "was for the purpose of showing that all cars that come around there (the curve) sway." The only purpose for which such testimony could possibly be admissible would be to show that the sway of the car was unusual or extraordinary, and it seems not improbable that this could not be shown by the movements of a car other than the one in which the accident occurred. In the moving picture, the car, because of greater speed, might

possibly have swayed more than the car in which the accident took place. If so, the sway of that car could not be relied upon as representing the movements of the car in question. Moreover, the rapidity of the movement or the sway of the car appearing on the screen was subject to the manipulation of the camera man, who took the picture of the car. It was within his power to make the movements appear faster or slower than the car was actually going. Questions of convenience and possible confusion in the court room might have to be considered. When moving pictures might and might not be used advantageously and properly in placing the facts before juries is a question the answer to which must vary with one case and another, and we think the decision in each case must be left largely to the judgment and discretion of the presiding judge, without any restricting general formula laid down to control him. In this case there were other available means of proving with accuracy the movements of the car, and we do not see any ground for holding that the court acted erroneously in excluding the resort to moving pictures.

After a careful examination and consideration of all of the exceptions appearing in the record, we find no reversible error in the court's rulings thereon, and the judgment will be affirmed.

*Judgment affirmed, with costs.*