## CHARLES BAUR et al. *v.* GEORGE CALIC.

[No. 124, October Term, 1933.]

388

*Decided April 4th, 1934.*

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, and Parke, JJ.

*Edward L. Ward* and *Joseph T. Parr,* with whom were *Rome & Rome* on the brief, for the appellants.

*L. Wethered Barroll* and *H. Arlington Blood,* with whom was *Fendall Marbury* on the brief, for the appellee.

Pattison, J., delivered the opinion of the Court.

This is an appeal from a judgment recovered by George Calic, individually, and to the use of Travelers' Insurance Company, against Charles Baur and Frank Baur, trading as Baur Brothers, and H. C. Sutter, for injuries sustained by George Calic in falling or being thrown from an automobile truck, caused, as alleged, by the negligence of the

appellants in the management and operation, by their servants, of the truck.

This appeal presents the following questions: First, whether there was legally sufficient evidence of primary negligence on the part of the driver of the truck, imputable to the appellants. Second, whether the appellee was guilty of contributory negligence, as a matter of law. Third, whether the driver of the truck was the servant of the appellants, or either of them, at the time of the accident. Fourth, whether the trial court committed prejudicial error wtih respect to the rulings on certain evidence.

It is disclosed by the record that the James McGraw Company of Philadelphia was employed by the Pennsylvania Railroad Company to prepare, in part at least, its road between Philadelphia and Baltimore for electrification. To do this work, McGraw Company hired trucks, with a driver for each, from H. C. Sutter, one of the appellants, at and for the sum of $1.60 per hour, or $16 a day, working ten hours. Sutter had no trucks and was obliged to hire them from others. Some of these he hired from Baur Brothers, of Philadelphia, the other appellants. He was to pay for the truck and driver the sum of $1.25 per hour. The men employed by the McGraw Company lived in camps, along the road, which were moved from time to time as the work progressed. The camps, at times, were several miles from where the work was being done, and by the agreement of the men with the McGraw Company, they were to be furnished by it with transportation to and from their work. The trucks hired by the McGraw Company from Sutter were not only to be used for general purposes, but, as many of them as were needed, were also to be used in the transportation of the men; the charge therefor being the same as when used for general purposes.

On the 9th day of November, 1931, the appellee, George Calic, one of the workmen, in returning from his work to the camp or his lodging place at Middle River, upon one of the trucks that Sutter had hired from Baur Brothers, was injured by falling from and being run over by the truck.

After the accident and injury, Calic applied for and obtained an award from the State Industrial Accident Commission of Maryland for the injuries he had received. This award and the expenses incident to the injuries caused by the accident were paid by the Travelers' Insurance Company, the insurer of the employer, the James McGraw Company, and this suit is now brought by George Calic, individually, and to the use of Travelers' Insurance Company, to recover damages against Baur Brothers and Sutter for the injuries he received.

There is contained in the record the following evidence, reflecting upon the two first questions here involved: (1) Whether there was legally sufficient evidence of primary negligence on the part of the driver of the truck; and (2) was the appellee guilty of contributory negligence, as a matter of law.

George Calic, the plaintiff, an employee of the James McGraw Company, testified that on November 9th, 1931, he, with other workmen, quit his work at the usual time, 5.30 o'clock in the evening. At the time "it was pretty dark"; that he got on the truck, near the railroad track where he had been working, to ride to his boarding house at Middle River. He did not know who was driving the truck. "About thirty, thirty-five or maybe forty men got on the truck"; some were in the truck, others on the outside of the truck, on the footboard and fenders. He was standing on the running board on the left side. Two other men were on that side, sitting on "the fender and between the hood," one facing the front and the other the rear of the truck, and the witness with his legs stretched out on the running board. When asked, "Well, how much room did you have?" he answered, "Well, I had about room for one good foothold." He was standing up facing the cab, with his left hand "by the door of the cab (that is, holding on to the door or frame of the door) * * * with the right hand I didn't have any good hold. I just supported my right hand anywhere I could, on the corner of the back of the cab. * * * It was kind of round and you could not get much hold on it, but it was

pretty fair as long as the truck was running nice * * * but * * * I had a good hold with my left hand." When asked, "Was that the place you got on the truck when it started * * * ?" he said: "Yes, sir; that was the only place for me to ride." He rode in this position for a distance of about two and a half miles. When about to get on the truck, the driver said: "Come on boys. come on, I ain't going to sit here and wait for you fellows all night here. * * * I had never ridden on the running board before and I never heard the chauffeur say anything about riding on the running board." When they got near Eastern Avenue, "we stayed there and waited for this other truck that was coming from the other direction—from Chase." When it came, he thought, if there was room, he would get in it; but there were other men there, and as "soon as the other truck come they loaded" on it. "It was just as many men as the truck I was on." There were men on the running board of that truck. Had there been none on its running board, he said: "I would change my place * * * and he alone on the running board of that truck. * * * Other than riding in this truck (the one he was in) or the one that met it at Eastern Avenue, there was no other truck that I know of to bring the men back to their homes." The two trucks then, he stated, started down towards Middle River. When they reached the place where the truck driver always stopped and "where I was to get off * * *, he didn't stop. He went on over this spot and I hollered at him twice to stop, and at the same time I changed my position, my foot-hold, getting ready to get off and he swung to the right, swerved to the right, made a kind of jerk, I couldn't tell you what, because I am not a driver. I couldn't drive a truck. * * * This was right after I called the second time to stop that he made that swerve to the right," and "I lost the grip after he made that jerk. When he swerved the truck and gave the jerk I slipped off that quick and find myself under the wheel, the back wheel on the left side." He could only see the driver when getting on the truck. He could not see him after that time. "I just had enough space on that running board to squeeze both of my feet on the back hand

(end) of the running board." Q. You changed your foot-hold? A. Yes, sir. Q. What do you mean by that? A. Well, now I am standing here (indicating) standing up facing the cab and as I said, I just had enough room for both feet, and after I hollered at him twice to stop I tried to turn myself kind of to the left to face forward." He was asked on cross-examination: "Didn't you then jump? A. No, I didn't." The effect of the jerk, as he stated, was to break the grip of his left hand upon the car, and it was then that he fell off and the wheels went over his leg.

Other witnesses testified, corroborating the evidence of the plaintiff as to his position on the running board and also as to the swerving or jerking of the car; one or more of them testified that they had difficulty, because of the jerking or swerving of the truck, in maintaining their positions or remaining on the truck.

Stephen Klasanovich, in describing the movement of the truck, said: "He (speaking of the driver) give such a jerk * * * so pretty near I fall myself, but I was on the right side running board, * * * but the turn was so quick on the right side with a big jerk." Unlike the plaintiff, who was on the left side of the truck, the sudden turn to the right would have had the effect of throwing him (the witness) against, and not away from, the truck. Witness further testified that there was no room for any one to get on the second truck, which they met at Eastern Avenue, and these were the only two trucks furnished, on that occasion at least, for the transportation of the men. Louis Kardnovich testified that "the truck was slowing a little bit, and he go ahead quick and after that I heard somebody cry out loud."

Burkins, the driver of the truck, testified that he did not know Calic, the plaintiff, and could not say whether he rode in his truck before that night or not. When he got on the truck on the night of the accident, he asked to be let off at Middle River. He heard "somebody holler there was a man fell off," and he went back and found that he had run over the plaintiff. At the time he was slowing down to let him off. "I beared off to the right, I didn't cut short or nothing

like that—beared off like I was going to stop, when some-
one hollered 'stop,' or somebody fell off. * * * There were
between twenty and twenty-five men on the truck that night.
It was a two and a half ton truck with a dump body."
"Whether Calic was on the seat, on the running board, or on
the truck, I couldn't say. On the side of the truck, I mean.
He wasn't there when we left at the job. When Calic told
me he wanted to get off at Middle River, he was standing
on the ground on the side of the truck. I told him to get
back on the other truck, there wasn't room here. Whether
he got on or not I couldn't say."

Philip Libertini, a witness called by the defendants, testi-
fied he was sitting up beside the driver; if so, he was on the
right of the driver. He saw Mike Milosinovich, who was
seated on the tool box upon the left side running board, and
he also saw an Italian fellow, sitting on the running board
ahead of Mike, and: "From where I was sitting I could see
George out on the running board. He was upon the left side.
* * * I think the driver sees the other fellow (George) be-
cause he told him to get off the truck and get on the other
truck. * * * The driver was sitting right alongside of me and
he was closer to these men than I was."

Other evidence was offered by the defendants as to the
happening of the accident, including the alleged jerking of
the truck, and the conduct and position of the plaintiff upon
the truck; but this evidence, though tending to contradict the
plaintiff's evidence, is not important in determining the ques-
tions under consideration, that is, whether there was primary
negligence on the part of the driver of the truck, legally suffi-
cient to go to the jury, or contributory negligence on the part
of the plaintiff as a matter of law, for in the determination
of those questions we must assume the evidence of the plain-
tiff to be true.

First, as to the question of primary negligence: There was,
we think, enough evidence to carry the case to the jury. These
men were to be provided with safe transportation to and from
their work. This transportation was by means of trucks.
It is shown that the men were permitted to take their posi-

tions in the body of the truck until it was filled, and thereafter to crowd into the cab of the truck with the driver, and to ride upon the running boards and fenders of the truck, until it would hold no more. This was not only true so far as the occasion upon which the plaintiff was injured, but also on other occasions, and this was known, not only to the driver, but also to those whose duty it was to provide a sufficient number of trucks to enable the men to ride thereon in positions of safety. The practice of allowing the men to ride upon the trucks in the manner stated necessarily increased the dangers of their travel, and, because of such fact, there was imposed upon the driver a corresponding increase of care in the performance of his duty in the operation and management of the car. That which is said to have caused the accident resulting in the injury to the plaintiff was the failure of the driver to slow down in time to stop his truck at the point where he was asked to stop it to let off the plaintiff and others, which necessitated stopping it more suddenly than otherwise would have been necessary, and, at the same time, causing him to turn more suddenly to the right of the road in order to allow those upon the truck to alight therefrom in safety. The sudden stopping and turning or swerving to the right of the road produced what is described by the plaintiff's witnesses as a "jerk," "a violent jerk," or, as one said, the turn was made "so quick on the right side with a big jerk." It is true that the defendants' witnesses described the movement complained of as not amounting to a jerk, but only a "bearing off" to the right.

The defendants have cited a number of cases wherein it has been decided by this court that recovery can be had for injuries caused by the motions or movements of a street car, where such motions or movements are unusual and extraordinary, but not for movements that are usual, ordinary, and incident to its operation. *State, use of Charles, v. United Rys. & Electric Co.,* 101 Md. 183, 60 A. 249; *Dawson v. Md. Elec. Ry. Co.,* 119 Md. 373, 86 A. 1041; *Callis v. United Rys. & Elec. Co.,* 128 Md. 406, 97 A. 715; *Hagerstown & Frederick Ry. Co. v. State, use of Cunningham,* 129 Md. 318,

99 A. 376; *Brocato v. United Rys. & Elec. Co.,* 129 Md. 572, 99 A. 792; *State, use of Chima, v. United Rys. & Elec. Co.,* 162 Md. 404, 159 A. 916. The cases in which recovery may be had under this rule is where the injury complained of resulted from the negligent operation or management of the car by the company's servant, or where the company itself has allowed its property, consisting of the roadbed, rolling stock, etc., to get out of repair or in a condition causing the injury for which suit is instituted; and not from any movement, usual, natural, and incident to the operation of the car. These cases, we think, differ materially from the case under consideration. Here, the act complained of was not caused by any alleged defect in the truck, nor was it necessarily incident to its operation, but it was caused, as alleged, by the negligent act of the driver.

Here, these workmen were to be transported in trucks to and from the work, free of charge. At the close of the day, trucks were brought to places convenient for them to be carried to their homes. One truck, and no more, was furnished the gang of which the plaintiff was a member. This truck was not sufficient to carry all, unless some of them rode on the fenders and running boards. They were told to get in the truck, the driver saying to them that he would not "wait all night" for them. Some of them, including the plaintiff, who could not get on the inside of the truck, got upon the fenders, and the fact that he was there could or should have been known to the driver. The plaintiff was not told not to ride upon the fender. The driver says he told him to take the next truck. It would seem, from the driver's statement, that when he told him this, he had not taken a position upon the truck; but whether he told him at that time, or later when they reached Eastern Avenue, is rendered doubtful by the evidence of Mike Milosinovich, offered by the defendants, who testified that he heard the driver tell Calic to get off the truck and get on the other truck. The only truck in evidence on that day, other than the one plaintiff was on, available for transportation of these men, was the truck they met at Eastern Avenue, and Calic explains why he did not get on that

truck, saying that he had intended to do so if there was any room for him, but there was none; that it was as much loaded as the one he was on. There was no truck present, at the time he started, in which he could have ridden, other than the one he took. The driver stated that when he told him to take the other truck, he was standing on the ground, while Milosinovich, witness of the defendants, said that he told the plaintiff to get off the truck. So it would seem that it was on Eastern Avenue, while the plaintiff was on the truck, upon which he had ridden half a mile or more to that place, that the driver told him to take the other truck, unless this was said to him at both places, and there is no claim made that it was.

In answer to the second question, we are of the opinion that the plaintiff was not guilty of contributory negligence as a matter of law, and this question was properly submitted to the jury for its determination. The fact that a plaintiff is riding upon a running board of a car is not, in itself, necessarily contributory negligence, depriving the plaintiff of the right to recover. Whether the act should have that effect is dependent upon the surrounding facts and circumstances of each particular case. *United Rwys. Co. v. Weir*, 102 Md. 286, 62 A. 588; *Vandall v. Sanders*, 85 N. H. 143, 155 A. 193.

In the case of *Strauss v. United Rwys. Co.*, 101 Md. 497, 61 A. 137, the plaintiff, an active and vigorous man, was a passenger on a summer car of the defendant, and, while seated at the end of the cross-seat nearest the footboard, first attempted, without success, by turning in his seat, to signal the conductor to stop at the next street. Then he stood up and beckoned to the conductor. While so standing there was a sudden and unusual jerk of the car, which threw the plaintiff off his balance and caused him to fall out. The trial court, upon this evidence, instructed the jury that "as the uncontradicted evidence in the case shows that the accident was caused by the contributory negligence of the plaintiff, their verdict must be for the defendant." This court reversed the trial court, and, in so doing, said:

"The law applicable to a case of this kind is clear. Unless there is some prominent and decisive act in regard to which there is no room for ordinary minds to differ, the case should not be withdrawn from the jury. *Winkelmann and Brown Case,* 88 Md. 91, 40 A. 1078.

"And again, when the nature of the act relied on to show contributory negligence can only be determined by considering all the circumstances attending the transaction, it is within the province of the jury to characterize it. *Baker v. Md. Coal Co.,* 84 Md. 19, 35 A. 10; *Cooke v. Traction Co.,* 80 Md. 558, 31 A. 327.

"The question of contributory negligence will not be taken from the jury unless the conduct of the plaintiff relied on as amounting in law to contributory negligence, is established by clear and uncontradicted evidence. *Lake Roland Co. v. McKewen Co.,* 80 Md. 593, 31 A. 797; *McMahon Case,* 39 Md. 449."

The plaintiff in this case knew that the workmen, while being transported to and from their places of work, were allowed, by those having control and supervision of their transportation, to ride upon the running boards, and, while not being specifically invited to take that position on the truck, the permission to do so, without warning of their danger by those in authority, closely approached, in effect, an invitation to ride thereon. By the evidence it does not appear that there could not be a difference of opinion among reasonable persons upon the question presented.

The injury complained of in this case, as alleged, was caused by the sudden, unexpected, and unusual jerk, resulting from the operation of the truck by its driver, and not by some usual and ordinary jerk, incident to its careful management and operation. If the plaintiff was in a position of safety, under the proper management and operation of the truck, he could not be said to be guilty of contributory negligence, as a matter of law, in not anticipating some unusual or violent jerk or swerving of the truck, caused by the negligent management of the driver. *Strauss v. United*

*Ry. Co., supra; Baltimore & Y. Turnpike Road v. Cason,* 72 Md. 377, 20 A. 113.

Upon the third question presented, whether the driver of the truck was the servant of the appellants or either of them, each of the defendants contends that, upon the facts of the case, the driver of the automobile truck, hired with it, ceased to be their servant when so hired. The question here involved came up for the first time, in this court, in this class of cases, in *Sacker v. Waddell,* in 98 Md. 43, 56 A. 399. In that case one Samuel Johnson, a farmer, assisted Waddell, the appellee, in threshing his wheat, by furnishing him two men, a wagon, and two horses, and he notified him when he would thresh his own wheat, and requested a return of help. Waddell said that he could only send him a single team and "Fred might go," and Johnson replied, "It was all right." At the appointed time, Waddell sent his son, Fred, who was about fifteen years of age, with a horse and wagon to Johnson's. Fred drove to the wheat field, and, before reaching the thresher, stopped in the field and got a load of wheat, which he carried from where it was stacked to the thresher, "without any instructions from Johnson or any one else." After Fred had taken one or two loads to the thresher, he hauled another, which he had unloaded, and as he was about to return to the stacks, he was called by Gambrill, one in charge of the work for Johnson, to come to him, and in doing so he ran over Claude Sacker, an infant son of the appellant. Fred did not see Claude until his horse was within a few feet of him, when he called to him to "look out," tried to check the horse, but Claude, in confusion, took a step backwards, and the wagon ran over and injured him. The action in that case was brought by Sacker, Claude's father, against Waddell, the father of Fred. At the conclusion of the testimony, the court instructed the jury that there was no legally sufficient evidence to entitle the plaintiff to recover, and directed them to find for the defendant. This action of the court was based on the theory that, at the time of the accident, the relation of master anad servant did not exist between the appellee and his son, but the latter was then

servant of Samuel Johnson, and under his control and direction.

In that case, Judge Boyd, in stating the law applicable to the facts of the case, cited and quoted from a number of cases in other jurisdictions, and, in the course of his opinion, he said:

"In the exhaustive notes to the case of *Hardy v. Shedden*, 37 L. R. A. 33, it is said on page 71 that the theory 'which is now established by an overwhelming weight of authority is that a servant sent to take charge of a chattel owned by his master, while it is placed at the disposal of another party for the performance of a given piece of work, is presumed to remain the servant of his general employer, and that some special circumstances apart from the mere fact of the hiring of the chattel must be put in evidence in order to overcome this presumption.'

"Although we are of the opinion that the law applicable to such cases is now well established to be as above stated, there may, of course, be circumstances which would relieve a master for injuries sustained by reason of the negligence of one who is in his general employ. The master may so hire or loan his servant to another for some special service as that he will, as to that particular service, become the servant of such third person. If the master has parted with all power of control over the servant, and permits the third person to make such use of him as he may deem proper, he may, *quoad* that service, be the servant of the third person, and not of the general master. * * * When the facts are such as to make it doubtful whether the relation between the servant and the original master continued for the particular service during which the accident happened, it is usually a question for the jury to determine. It is said in 2 *Thompson on Negligence*, p. 899, 'Whether the person whose immediate negligence or misconduct caused the particular injury was acting at the time as the servant of the person sought to be charged frequently depends upon such variety of facts that it falls outside of any definite rule, and for that reason becomes, under proper instructions, a

question of fact for the jury." See, also, *Kimball v. Cushman,* 103 Mass. 194; *Crockett v. Calvert,* 8 Ind. 127; *Larkin v. Burlington, C. R. & N. Ry. Co.,* 85 Iowa, 499, 52 N. W. 480.

"In *Deford's Case* (30 Md. 179), *supra,* the court said: 'The greatest difficulty, however, in these cases, is in determining, upon the facts, who is to be regarded as the master of the wrongdoer. This, of course, depends mainly upon the terms and character of the contract of employment. * * * The terms and manner of employment were, of course, matters of fact for the jury; it being for the court to declare the legal relation that existed between the parties, upon any given state of facts.'

"So * * * it would seem to be clear that when there is any real question, under the testimony, as to whether the relation of master and servant did exist between the negligent servant and the one sought to be held as master, as to the particular service in which the injury was sustained, it should be submitted to the jury. In this case the record does not present such clear facts as justified the court in determining, as a matter of law, whether such relation did exist, and that question should have been submitted to the jury."

See also, *Amer. Sugar Ref. Co. v. Gilbert,* 145 Md. 251, 125 A. 692; *Salowitch v. Kres,* 147 Md. 23, 127 A. 643; *Hooper v. Braumer,* 148 Md. 417, 129 A. 672; *Bentley, Shriver & Co. v. Edwards,* 100 Md. 652, 60 A. 283; *Dippel v. Juliano,* 152 Md. 694, 137 A. 514.

As already stated, the trucks used, with a driver for each of them, were hired by Baur Brothers, the owner, to Sutter, and he (Sutter) hired the trucks and drivers to the McGraw Company. The drivers were not selected by the McGraw Company, nor were their wages paid by it, nor was the right to discharge the drivers lodged in that company. As stated by Donovan, superintendent of the McGraw Company, if one of the drivers proved unsatisfactory, this fact would be brought to the notice of Sutter, and Sutter would discharge him, and another selected and used. Baur Brothers, in the first instance, selected the drivers. Whether those employed

to take the places of the discharged drivers were selected and named by Baur Brothers or Sutter is not made clear by the evidence in the case; nor is it shown that the McGraw Company had exclusive control and supervision over the drivers. It was shown that the McGraw Company directed them where to go and what to do, but it did not control the manner in which the trucks were to be driven. This was done by Sutter and Baur Brothers, who, it would seem, had assumed the responsibility of selecting efficient and capable drivers. Sutter was at the scene of the work whenever it was possible for him to be there. Charles Baur, of the firm of Baur Brothers, was also there much of his time in the employ of Sutter, and at times it would appear that one or both of them would direct the drivers as to how the trucks should be driven by them. Sutter testified that, upon complaint to him that the men were arriving late at their work, he, on one or more occasions, went to the camp to direct their movements, in respect thereto; while Baur testified that "the trucks were kept overnight at the camp. * * * We just thought it was the best place to keep them, near the men."

It can, we think, be inferred from the evidence that Baur, Sutter, and the McGraw Company exercised, at different times, control over the trucks and the drivers. The record, at least, does not present such clear facts as to justify the court in determining, as a matter of law, that the relation of master and servant did not exist between the appellants and the drivers of the trucks, and this being so, as was said in the *Sacker-Waddell* case, the question whether such relation did exist should have been submitted to the jury, as it was in this case.

We will not prolong this opinion by discussion of the admissibility of the evidence to which exceptions were taken by the appellants, but will say, we have carefully examined the record as to them, and we find no reversible error committed by the trial court with respect to them. The judgment of the lower court will be affirmed.

*Judgment affirmed, with costs.*