**SEA LAND INDUSTRIES, INC. and Sea-Land Service, Inc., Plaintiffs,**

v.

**The GENERAL SHIP REPAIR CORPORATION, Defendant.**

Civ. No. H–80–1393.

United States District Court, D. Maryland.

Jan. 13, 1982.

---

Richard R. Jackson, Jr., M. Hamilton Whitman, Jr., and Ober, Grimes & Shriver, Baltimore, Md., for plaintiffs.

David R. Owen, David McI. Williams and Semmes, Bowen & Semmes, Baltimore, Md., for defendant.

ALEXANDER HARVEY, II, District Judge.

In this civil action, plaintiffs are seeking to recover for losses sustained by them when their large, land-based crane, located at their marine terminal in the Port of Baltimore, was blown down the pier during a thunderstorm and damaged. Plaintiffs assert admiralty and maritime jurisdiction under Rule 9(h), F.R.Civ.P., and 28 U.S.C. § 1333. Alternatively, plaintiffs have invoked the diversity jurisdiction of this Court under 28 U.S.C. § 1332.

Sea Land Industries, Inc. and Sea-Land Service, Inc.[1] (hereinafter collectively referred to as "Sea Land"), the plaintiffs, have since 1967 operated their Sea Girt Terminal in the lower Canton area of the Port of Baltimore. Container vessels belonging to the plaintiffs are loaded and unloaded at this terminal by means of a large Paceco crane (hereinafter "the crane") located on the pier.[2] The crane moves on steel rails, and from time to time is positioned for the loading and unloading of containers on and from container ships docked alongside the pier. The General Ship Repair Corporation (hereinafter "General Ship") is engaged in the business of repairing ships, other water craft and their appurtenances and equipment.[3] In 1967, an agreement was entered into between Sea Land and General Ship, whereby the latter was to perform maintenance and other services for plaintiffs' crane. Over the years, General Ship furnished one or more of its employees to perform this crane maintenance and other work at the Sea Girt Terminal.

In the late afternoon of June 27, 1978, an employee of General Ship failed to secure the crane, leaving it unattended following its use. Shortly after 7:00 P.M., a thunderstorm suddenly hit the area, and a high wind blew the unsecured crane down its tracks. The crane collided with the concrete stops at the seaward end of the pier, causing extensive damage both to the crane and to the stops. In this action, plaintiffs are seeking to recover some $313,000 for damage to the crane and the crane stops and for additional operating costs incurred by the plaintiffs when they were unable to use the crane for the loading and unloading of their container ships in Baltimore.

The amended complaint is in three Counts. Count I alleges a breach of contract by the defendant. Count II asserts a breach by defendant of an alleged implied warranty of workmanlike performance. Count III is based on a theory of tort. Plaintiffs base all of their claims on this Court's admiralty jurisdiction, and further assert that they would in any event be entitled to the relief sought in all three Counts under the common law of the State of Maryland.

Defendant admits diversity jurisdiction but denies that admiralty jurisdiction exists in this case. Asserting that Maryland common law should be applied, defendant contends that the employee who was allegedly negligent was the borrowed servant of the plaintiffs, and that defendant therefore cannot be held responsible for any negligent act of that employee. Defendant also contends (1) that the employee in question was not negligent; (2) that defendant is not responsible for the accident because of an exculpatory "red letter clause" which was allegedly a part of the agreement between the parties; and (3) that plaintiffs were contributorily negligent or assumed the risk of the casualty to their crane on the date in question.

The case came on for trial before the Court sitting without a jury. Witnesses were heard and numerous exhibits were entered in evidence. Much of the evidence was conflicting, and in resolving these conflicts, due regard has been had to the credibility of the witnesses. Findings of fact and conclusions of law, pursuant to Rule 52(a), are contained herein, whether or not expressly so stated.

I

*The facts*

Sea Land owns and operates container ships and has container terminals at many different ports throughout the world for

---

1. Sea-Land Service, Inc. is wholly owned by and is the operating subsidiary of Sea Land Industries, Inc. Both are Delaware corporations, with their principal place of business in New Jersey.

2. Both the Terminal and the crane were leased by Sea-Land Services from another Sea-Land corporation under long-term leases expiring in 1992.

3. General Ship has over the years also performed other dockside work besides the repairing of ships.

the loading and unloading of its vessels. The Baltimore operation began in 1967, when Sea Land placed a single large gantry crane at its Sea Girt Terminal, located in the Canton area of the Port of Baltimore. Crane No. 261, the crane in question, was built by Paceco, Incorporated, a subsidiary of Fruehauf Corporation. It is a large structure, weighing approximately 500 tons and powered by electric motors. The operator sits in a cab 75 feet above the ground, and by its boom, the crane loads and unloads 20 foot by 40 foot containers on and off the container vessels brought alongside the pier.[4] All loading and unloading work was performed by the stevedores. The crane moves up and down the pier on steel rails embedded in the land alongside the pier where the container vessels dock. The rails extend generally some 700 feet, in a north-south direction along the pier. Steel-reinforced concrete blocks are sunk into the ground at both ends of the rails to serve as bumpers or stops and to keep the crane on the rails. When not in use, the crane is secured at a tie-down position at the north end of the pier. It is there held securely in place by two large metal pins which drop into sockets embedded in the surface of the pier and by four large turnbuckles, sometimes referred to as "hurricane tie-downs." The electric motors which move the crane up and down the rails are equipped with spring-loaded brakes. When away from its tie-down position, the crane can be held in place by rail clamps, which are cranked down to apply pressure against the top of the metal rails.

Crane maintenance is an important consideration in the operation of a marine terminal for container operations. To reduce the time in port, it is particularly important that there be no interruption to loading and unloading operations when container vessels are at the pier. If a crane breaks down during such operations, valuable time is lost while the ship remains docked awaiting the necessary repairs.

When it first came to Baltimore, Sea Land investigated various means whereby maintenance, repair and other work could be done for its newly-installed crane. General Ship had previously worked on Sea Land's shipboard container cranes, and following discussions between representatives of the parties, an oral agreement was reached whereby General Ship would furnish personnel to perform the services required.[5] The services rendered by personnel of General Ship included maintenance and repair work on the crane while it was not being used, stand-by services while the crane was being used for loading and unloading cargo, and movement of the crane into position for its loading and unloading work. Following its use on a particular day, the crane was returned by the General Ship employee to its tie-down position at the north end of the pier and firmly secured by means of the various tie-down mechanisms.

Pursuant to the agreement between the parties, General Ship supplied the personal services in question through Charles E. Morris, a skilled electrician, who was employed by General Ship and started working in August of 1967. Each day, Morris reported to the Sea Girt Terminal and performed the necessary services required by the contract between the parties. At the outset, there was not enough work for Morris to remain at the Terminal all day, and he worked in General Ship's Yard as well as at Sea Land's pier. In time, however, as business increased, Morris spent almost his entire time at the Terminal.

In 1977, Morris contracted cancer, and in February of that year, he had a colostomy operation. During the three months or so that Morris was recovering from his operation, other employees of General Ship performed the services required by the contract between the parties, including Thomas

---

4. Typically, a truck will haul a container trailer from the Terminal's parking lot to a position underneath the crane, which will then pick up a container, load it aboard the ship and unload another container, placing it on a trailer.

5. At the outset, General Ship furnished the required services under a subcontract arrangement with Westinghouse Electric Corporation.

J. Hoar and Dennis Mielkuski. After his cancer operation, it was necessary for Morris to use a colostomy bag, which required changing from time to time.

Following recovery from his operation, Morris returned to work in 1977 and continued to perform the required maintenance and other services at the Terminal. On June 27, 1978, the container vessel HOUSTON was berthed at the Terminal for unloading. In accordance with his usual practice, Morris had moved the crane into position for cargo operations by the longshoremen engaged by Sea Land and stood by while the unloading work proceeded. At approximately 6:10 P.M., following the completion of cargo operations, Morris moved the crane up the tracks to a point some thirty feet from the tie-down position and proceeded to do certain maintenance work to prepare for its use in connection with cargo operations on a vessel expected the next morning.[6]

At some time between 6:30 and 7:00 P.M., Morris experienced difficulty with his colostomy bag. Ordinarily, he kept a spare bag at the Terminal, but on that day, there was no spare on hand. Without notifying anyone on the pier, Morris left the Terminal and went home to replace his colostomy bag. However, he neglected to secure the crane in any way. The rail clamps were not cranked down, nor was the crane moved to its tie-down position and secured by means of the pins and turnbuckles. During the time that Morris was away from the Terminal, a fast-moving thunderstorm squall passed through the area, with winds reaching maximum speeds of 49 to 54 miles per hour. Robert Bialek, Sea Land's Marine Manager, was in his office on the pier completing certain paperwork when he looked up and saw the crane being blown down the pier by the strong winds. Powerless to stop the massive crane once it was moving, Bialek and James Huseman, a Cottman Company employee, left the office and watched the crane crash into the concrete stops at the south end of the pier. Both the crane itself and the stops were severely damaged. As a result, Sea Land's container operations at the Port of Baltimore were disrupted for a period of some three weeks.

## II

### *Jurisdiction*

In their amended complaint, plaintiffs allege admiralty jurisdiction. It is well established that a plaintiff has the burden of proving that the jurisdiction alleged does in fact exist. *Bowman v. White*, 388 F.2d 756, 760 (4th Cir. 1968). Plaintiffs contend that admiralty jurisdiction exists here because Counts I and II involve a maritime contract and because Count III involves a maritime tort.

### (a) *Maritime contract*

In considering the question of a federal court's admiralty jurisdiction over a contract claim, this Court recently said the following in *Maryland Port Administration v. SS AMERICAN LEGEND*, 453 F.Supp. 584, 589 (D.Md.1978):

> As a general principle, whether a particular contract is a maritime contract within a federal court's admiralty jurisdiction is determined by the nature and character of the contract and its nexus to maritime activity, irrespective of the location of contract performance. *See 7A Moore's Federal Practice*, ¶ .255 (2d Ed. 1977).

Citing 1 *Benedict on Admiralty*, § 183 at 11–6, plaintiffs contend that the contract between the parties in this case was a maritime contract because it relates to a ship and commerce and to navigation and the transportation of cargo on navigable waters. But the broad statement relied upon was qualified by the later observation in the same text that maritime character of the nature to attract admiralty jurisdiction "does not attach to a contract merely because the services to be performed under

---

**6.** The vessel BALTIMORE was scheduled to arrive at the pier the next morning for the loading and unloading of cargo.

the contract have reference to a ship, or its business, or that the ship is the object of such services or that it has reference to navigable waters." *Id.,* § 183 at 11–7.

Obviously, there are many contracts which relate in some way to a vessel or to maritime matters which are not maritime contracts. What must be determined in a case of this sort is whether the maritime connection is sufficiently substantial to serve as a basis for the exercise of admiralty jurisdiction. Each case then must be decided under its own peculiar facts. As the Supreme Court said in *Kossick v. United Fruit Co.,* 365 U.S. 731, at p. 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 (1961):

> The boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw. Precedent and usage are helpful insofar as they exclude or include certain common types of contracts.

It is clear that a stevedoring contract for the loading or unloading of cargo is a maritime contract. *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 217, 37 S.Ct. 524, 529, 61 L.Ed. 1086 (1917); *New Orleans Stevedoring Co. v. United States,* 439 F.2d 89, 92 (5th Cir. 1971). Moreover, a contract to repair a vessel has been held to be a maritime contract. *Alcoa Steamship Co. v. Charles Ferran & Co.,* 383 F.2d 46, 50 (5th Cir. 1967), *cert. denied,* 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107 (1968); *Flota Maritima Browning de Cuba, Sociadad Anonima v. The CIUDAD DE LA HABANA,* 181 F.Supp. 301, 308 n.10 (D.Md.1960). On the other hand, a contract for the building of a vessel is non-maritime. *Thames Towboat Co. v. The FRANCIS MCDONALD,* 254 U.S. 242, 41 S.Ct. 65, 65 L.Ed. 245 (1920). Also held to be non-maritime have been a contract whereby a stevedore rented a machine and an operator to assist in discharging cargo, *T. Smith & Son, Inc. v. Rigby,* 305 F.Supp. 418 (E.D.La.1969), and a contract to sell electric blowers to a shipyard for the purpose of removing gas from tank barges. *In re Alamo Chemical Transportation Co.,* 320 F.Supp. 631 (S.D.Tex.1970).

The contract in this case which was initially entered into in 1967 is partly oral and partly written. It is a contract whereby General Ship agreed to provide personal services for Sea Land's shore-based crane. The services included maintenance and repair of the crane, the movement of the crane to and from position for its use by longshoremen and standing by for repairs and maintenance if there was a breakdown during cargo operations.

Contracts to perform certain types of services relating to a shore-based crane would obviously be non-maritime. A contract to build a crane, a contract to transport it to a waterfront location and a contract to install it there on land would hardly have a sufficient nexus with maritime activities to be the basis for admiralty jurisdiction. On the other hand, a contract to use a crane of this sort for the loading or unloading of container ships would, like a stevedoring contract, be maritime in nature. *See Maryland Port Administration v. SS AMERICAN LEGEND, supra.* The facts here fall somewhere in between these two extremes.

After considering all the evidence presented, this Court finds and concludes that the contract sued upon in this case is non-maritime in nature. A land-based structure was involved. Maintenance and repair of this crane is no more closely connected to maritime activity than would be similar services performed for some other fixed structure like a shed or other building located on a pier. The mere fact that some of the services performed by General Ship's employees included moving the crane into position for its use by longshoremen would not supply a sufficient nexus with maritime activity so as to make this a maritime contract. It could hardly be said that a contract for the delivery of a fork lift truck or other equipment to a pier for use by longshoremen in cargo operations would be maritime in nature. Activities involving the maintenance of and the movement of this land-based structure do not have a sufficient nexus to maritime activity to serve as the basis for the exercise by this Court of

admiralty jurisdiction, particularly when the contract is considered in its entirety.

Plaintiffs' reliance on *Maryland Port Administration v. SS AMERICAN LEGEND, supra,* is misplaced. The contract involved in that case was between the owner of port terminal facilities and a stevedoring company for the rental of container-handling cranes for the unloading of a cargo vessel. This Court noted the similarity of the contract at issue there to stevedoring and wharfage contracts. Moreover, it was conceded by the stevedoring company in that case that had the shipowner contracted to rent the cranes, the contract would be maritime and within admiralty jurisdiction. 453 F.Supp. at 590.

For these reasons, this Court concludes that the contract in this case between Sea Land and General Ship was not a maritime contract. Accordingly, no admiralty jurisdiction exists as to Counts I and II.

### (b) *Maritime tort*

■■ It is even clearer under the evidence produced at the trial that this case does not involve a maritime tort. Historically, the maritime tort jurisdiction of federal courts has been determined by the locality of the accident. In a tort action, the claim is cognizable under traditional federal admiralty jurisdiction only if the wrong occurred on navigable waters. *Holland v. Sea-Land Service, Inc.,* 655 F.2d 556 (4th Cir. 1981). In this case, the negligent act occurred solely on land. As noted, a land-based structure was involved, and the physical damage was sustained by the structure and by concrete stops embedded in the earth.

Dispositive of the question of the existence of a maritime tort under the facts of this case is the Supreme Court's decision in *Victory Carriers, Inc. v. Law,* 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971). There, a longshoreman driving a fork lift truck was injured while operating the vehicle on a pier in the course of loading a vessel. The Supreme Court held that no maritime tort was involved since the accident occurred on land. The Court rejected the argument that there was admiralty jurisdiction merely because the longshoreman had been injured on a pier in the course of loading operations. As the Supreme Court pointed out in the *Victory Carriers* case, state law has traditionally governed accidents like that one. 404 U.S. at 212, 92 S.Ct. at 425.

Relying on *Carroll v. Protection Maritime Insurance Co.,* 512 F.2d 4 (1st Cir. 1975), plaintiffs contend that a different test should be applied in a case in which the tort is intimately connected with a maritime contract. However, the *Carroll* case involved a seaman, and it is doubtful whether its principles would be applied to a shore-based worker like the one involved here. In any event, this case does not involve a maritime contract. Therefore, even if the *Carroll* rationale were to be applied here, there was no maritime tort because no maritime contract existed with which the tort was inter-connected.

Accordingly, this Court does not have admiralty jurisdiction of the tort claim asserted in Count III of the amended complaint.

### (c) *Diversity jurisdiction*

■ In their amended complaint, plaintiffs assert in the alternative that diversity jurisdiction exists in this case. Defendant concedes that diversity jurisdiction exists and that state law governs the claims asserted by the plaintiffs in this case. However, defendant contends that Count II should be dismissed because the cause of action alleged there is not cognizable under Maryland law. This Court would agree.

Count II is based upon the breach by defendant of an alleged implied warranty of workmanlike performance implicit in the contract between the parties. This type of warranty was recognized by the Supreme Court in *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.,* 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964), and is distinctly maritime in nature. A review of the Maryland cases cited by the parties indicates that the Maryland courts have never recognized any such warranty as a part of Maryland contract law. Indeed, the *Italia Societa* case has been rarely cited by the Maryland appellate courts, and even

**558**

then only in connection with a discussion of the substantive maritime law governing a stevedoring contract. *See Orient Overseas Line v. Globemaster Baltimore, Inc.*, 33 Md. App. 372, 393, 365 A.2d 325 (1976).

Plaintiffs rely on the offhand comment contained in *Board of Education of Charles County v. Crawford*, 284 Md. 245, 259, 395 A.2d 835 (1979), to the effect that a contract for services implies a warranty of workmanlike service. But that statement is hardly support for the conclusion that Maryland law has recognized, in a contract case involving the performance of personal services, the existence of a separate right of action based on the alleged breach by the defendant of an implied warranty of workmanlike performance. Whatever rights plaintiffs have because of the breach by General Ship of this contract are governed by Maryland contract law and not by the admiralty principles established in the *Italia Societa* case.

For these reasons, Count II of the amended complaint will be dismissed.

### III

#### Negligence

■ That Morris was negligent clearly appears from the evidence in this case. An experienced employee of General Ship since 1967, Morris in June of 1978 was fully aware of the necessity of firmly securing the crane when it was not in use. Moreover, he was familiar with and regularly used all of the different securing devices which were available to prevent movement of the crane. Unaccountably, not only did Morris leave the crane unattended and unsecured in the late afternoon of June 27, 1978, but he also did not tell Bialek or anyone else on the pier that afternoon that he was leaving. And indeed, no one knew he was gone until after the accident had occurred.

At the trial, Morris testified that he normally tied the crane down when he left to

go home. He further admitted that he knew that the crane should be secured whenever he left it. Indeed, when he arrived home on this occasion, he suddenly remembered that he had forgotten to secure the crane, and he asked his wife to call Bialek and tell him that the crane had not been tied down. However, before that call could be made, Bialek had called Morris and told him to return to the Terminal because the crane had been blown down the rails and damaged.

It was no excuse that Morris was having difficulty with his colostomy bag and needed to replace it. No medical emergency was involved but only a matter of personal convenience. It would have taken only a short period of time for Morris to do what was necessary to prevent movement of the crane in a sudden high wind.[7] There was ample time following the completion of cargo operations on the HOUSTON for the movement of and tying down of the crane before the storm reached the Terminal. At the very least, Morris, if faced with a personal emergency, should have told Bialek or someone else at the Terminal that he was leaving to go home and that the crane was not secured. He did neither, and his acts and omissions on the late afternoon of June 27, 1978 constituted a lack of due care on his part.

The facts further show that the negligence of Morris was the proximate cause, and the sole proximate cause, of the damage to the crane and the stops. The various devices available for tieing the crane down were designed for the express purpose of avoiding movement of the crane by high winds, as occurred here. There was no need for Sea Land to take other precautionary measures. Sea Land had every right to rely on the expectation that Morris would carry out the responsibilities assigned to him, as he had always done. It was Morris' failure to act with reasonable care which was solely responsible for this accident.

7. Morris did not even crank down the rail clamps when he left the pier late that afternoon.

## IV

### The borrowed servant defense

The principal defense asserted by General Ship in this case is that Morris was the borrowed servant of Sea Land and that therefore his negligence cannot be attributed to the defendant General Ship. Indeed, a large part of the evidence in this case related to the question whether the plaintiffs or the defendant are responsible for the acts and omissions of Morris which caused the damage in question.

State and federal law concerning "the borrowed servant" doctrine are essentially the same. The most frequently cited case discussing the applicable principles is *Standard Oil Co. v. Anderson*, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909), in which the Supreme Court said the following at pages 221–222, 29 S.Ct. at page 254:

It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men become *pro hac vice* the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. To determine whether a given case falls within the one class or the other, we must inquire whose is the work being performed—a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking.

Maryland cases apply basically the same test. In *Keitz v. National Paving & Contracting Co.*, 214 Md. 479, 134 A.2d 296 (1957), the Court of Appeals said the following, at page 491, 134 A.2d at p. 301:

Coming now to the main question involved herein, it has been stated by this Court that there are at least five *criteria* that may be considered in determining the question whether the relationship of master and servant exists. These are: (1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is a part of the regular business of the employer. Standing alone, none of these *indicia*, excepting (4), seems controlling in the determination as to whether such relationship exists. The decisive test in determining whether the relation of master and servant exists is whether the employer has the *right to control and direct the servant in the performance of his work and in the manner in which the work is to be done.* It will be noted from the above, it is not the manner in which the alleged master actually exercised his authority to control and direct the action of the servant which controls, but it is his *right* to do so that is important. (Emphasis in original)

More recently, the Court of Special Appeals in *L.M.T. Steel Products, Inc. v. Peirson*, 47 Md.App. 633, 425 A.2d 242 (1981), said the following, at page 635, 425 A.2d at page 244:

The rules which define the distinction between the relationship of employer-employee and that of independent contractors—which tell us, in other words, when a person is an employee/servant and not

an independent contractor—are fairly well settled. As pointed out in *B. P. Oil Corp. v. Mabe*, 279 Md. 632 [370 A.2d 554] (1977), there were originally four elements to be considered in determining the existence of the master-servant relationship, these being "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power of dismissal, and (4) the power of control of the servant's conduct." *Sun Cab Co. v. Powell*, 196 Md. 572, 577–78 [77 A.2d 783] (1951), quoted in *Mabe*, 279 Md. at 638 [370 A.2d 554]. In *Keitz v. National Paving and Contracting Co.*, 214 Md. 479, 491 [136 A.2d 229] (1957), the Court added a fifth element to be considered—"whether the work is a part of the regular business of the employer."

As the Court was careful to point out in *Keitz*, however, and in nearly every case involving this issue decided since *Keitz* (see, for example, *Mabe* [279 Md.] at 638 [370 A.2d 554]), these are but *indicia* of the employment relationship—factors or criteria to look at. Only one of the five has any special conclusive significance; that is element four, the power or right to control, with some immediacy and directness, the alleged servant's work. If that *right* of control is present, the relationship is necessarily one of employment, because it negates the independence or autonomy presumed to exist with an independent contractor. (Emphasis in original)

In this particular case, the first three and the fifth criteria point to the existence of a master and servant relationship between Morris and the defendant General Ship. Morris was selected by General Ship, was hired by General Ship and was treated by General Ship as one of its employees. He was paid a salary by General Ship, based on the number of hours worked, plus overtime, and he also received other employment benefits.[8] General Ship carried workmen's compensation and liability insurance covering Morris as well as its other employees. Morris was guaranteed forty hours of work per week, and for the first seven or eight years of his employment, he performed work at General Ship's Yard if his total time at the Terminal did not reach that figure. Federal and state deductions were made by General Ship from Morris' wages. General Ship had the power to discharge Morris and eventually did discharge him in November of 1978. General Ship provided substitutes for Morris when he was ill, when he was on vacation or when extended work periods required relief personnel. When additional labor was required for particular repairs, General Ship sent welders, riggers or machinists to the Terminal to do the necessary work. Although Morris after 1974 or 1975 performed all of his work at Sea Land's Terminal, close contact was regularly maintained with his employer. Every day, Morris (or his substitute) would call his superior, John Schmick,[9] and would report on the hours worked and the jobs performed at the Terminal that day.

This Court further finds that the work that Morris did at Sea Land's Terminal was a part of the regular business of General Ship. Although conceding in its Trial Memorandum that it does a certain amount of industrial maintenance and repair work, defendant argues that it ordinarily does not do such work on land-based cranes. However, General Ship regularly worked on cranes located on vessels and had in the past repaired cranes on container vessels. The furnishing of a skilled electrician to do maintenance and repair work for a land-based crane used in cargo operations is hardly so different from what General Ship usually did in the course of its harborside activities as to be considered outside the scope of its general business.

■ The most hotly contested factual issue in this case is whether Sea Land or General Ship had the right to control and direct Morris in the performance of his

---

8. Morris was covered by General Ship's profit-sharing plan, its group insurance plan and its Blue Cross and Maryland Dental plan.

9. Schmick was Vice President of General Ship and was generally responsible for performance of the contract with Sea Land.

work and in the manner in which the work was to be done. In considering the evidence pertinent to this issue, it should be noted that the Maryland courts have emphasized that it is not the manner in which the alleged master *actually* exercised his authority to control and direct the action of the servant which is decisive, but it is the master's *right* to do so that is important. *See Keitz, supra,* 214 Md. at 491, 136 A.2d 229.

Pointing out that Morris regularly performed his duties at the Sea Girt Terminal, defendant argues that Sea Land and not General Ship directed and controlled the activities of Morris and supervised his work. Defendant relies on the fact that it was Sea Land's written maintenance manuals which Morris followed at the site, and on the fact that his duties included compliance with Sea Land's check lists and filling out Sea Land's forms. However, Sea Land's general maintenance requirements were known from the outset and were a part of the agreement between the parties. Attached to the original job order issued by Sea Land in June of 1967 were some of Sea Land's check list forms and other documents outlining the maintenance services to be furnished by General Ship.

In contending that General Ship retained ultimate authority to control and direct the actions of Morris, Sea Land asserts that the agreement between the parties did not contemplate that Morris or any other employee of General Ship was to be the borrowed servant of Sea Land. Plaintiffs point out that this was a personal service contract as to which General Ship retained the ultimate right of control over Morris or any other employee sent to the Terminal to perform the services, including the right to assign Morris or such other employee to work elsewhere if General Ship chose to do so.

Plaintiffs further rely on evidence indicating that General Ship from time to time sent riggers, welders and other employees to the Terminal to do work on the crane when required. As plaintiffs correctly assert, these other employees, who worked alongside Morris when their services were required, were hardly borrowed servants of Sea Land under the *Keitz* test.

None of the many "borrowed servant" cases cited by the parties involve facts closely approximating those present in this case. The "borrowed servant" doctrine arises in many different factual contexts, and the underlying policy determinations would appear to be different, depending upon the type of case and depending upon whether the doctrine is asserted offensively (to support a recovery) or defensively (to support a defense).

First, there are the third-party cases like *Keitz v. National Paving & Contracting Co., supra,* in which the injured third party sues either the general employer or the special employer.[10] In *Keitz,* the injured third party sued both the general employer and the special employer. The trial court directed a verdict for the special employer, and the jury found in favor of the plaintiff against the general employer. Holding that a servant can have two masters and that there was sufficient evidence for the case to go to the jury on the question whether the special employer was also responsible for the acts of the negligent servant at the time of the injury, the Court of Appeals reversed and remanded the case for trial on that issue alone. In *L. M. T. Steel Products, Inc. v. Peirson,*[11] *supra,* the injured third party sued the purported employer of the negligent individual and won a jury verdict. On appeal, the employer argued that the negligent individual was an independent con-

---

**10.** The term "general employer" will be used to refer to the lending party and the term "special employer" will be used to refer to the borrowing party. In this case, Sea Land is the special employer and General Ship the general employer.

**11.** The *L. M. T. Steel Products* case was not technically a borrowed servant case. However,

the decision is pertinent here because of its discussion of the principles to be applied in Maryland to determine a master-servant relationship and because the facts are analogous to a situation where a general employer attempts to escape liability to an injured third party by using the "borrowed servant" doctrine defensively to shift liability to a special employer.

tractor and not the defendant's employee. The Court of Special Appeals affirmed the verdict, holding that there was sufficient evidence of a master-servant relationship to support the verdict against the employer. In *Sacker v. Waddell*, 98 Md. 43, 56 A. 399 (1903), the injured third party sued the general employer, which raised the "borrowed servant" doctrine as a defense, seeking to shift liability to the special employer, which had not been named as a defendant in the suit. The Court of Appeals reversed a directed verdict for the general employer, holding that the issue was one for the jury to determine. In *Dippel v. Juliano*, 152 Md. 694, 137 A. 514 (1927), the injured third party sued both the general employer and the special·employer. A jury verdict against the special employer was affirmed by the Court of Appeals. In these four third-party cases, the "borrowed servant" doctrine was asserted offensively with success by the plaintiff against the special employer in both *Keitz* and *Dippel*. However, the general employer was unsuccessful in asserting the doctrine defensively to shift liability to the special employer in both *L. M. T. Steel Products, Inc.* and *Sacker.*

The second type of "borrowed servant" cases are those involving workmen's compensation. In *William J. Burns International Detective Agency, Inc. v. Ferris*, 16 Md.App. 568, 299 A.2d 487 (1973), the general employer appealed an award of workmen's compensation benefits, claiming that the special employer should have been the one to pay. The employee had claimed workmen's compensation benefits from both the general employer and the special employer. The Court of Special Appeals affirmed the Commission's determination that the claimant was the employee of the general employer and not the borrowed

servant of the special employer. In *Sun Cab Company v. Powell*, 196 Md. 572, 77 A.2d 783 (1951),[12] it is not entirely clear from the opinion which of the two employers can most accurately be characterized as the general employer and which as the special employer. The injured employee worked at a cab company servicing tires. Presumably then, the tire company was the general employer and the cab company was the special employer. The Commission had found the claimant to be the employee of the special employer. On appeal to a state trial court, the jury found the claimant to be the servant of the general employer. The Court of Appeals affirmed that verdict. In *Snider v. Gaultney*, 218 Md. 332, 146 A.2d 869 (1958), the general employer asserted that the claimant was not entitled to workmen's compensation benefits from it because the claimant was an independent contractor. The jury found in favor of the claimant, but the trial court entered a judgment n. o. v. in favor of the general employer. The Court of Appeals reversed, finding that there was sufficient evidence for the jury to find that the general employer was responsible for workmen's compensation benefits. Thus, in the compensation cases, *Sun Cab* involved a successful offensive use of the "borrowed servant" doctrine by a claimant to recover benefits from a special employer. On the other hand, *Ferris* and *Snider* were cases in which the general employer unsuccessfully relied on the doctrine as a defense in seeking to avoid liability for the payment of compensation benefits.[13]

■ Finally, there are the cases like this one between a general employer and a special employer. The only Maryland case of this sort to be cited is *Hercules Powder Co. v. Harry T. Campbell Sons Co.*, 156 Md. 346,

---

12. Both *Burns* and *Sun Cab* are not technically "borrowed servant" cases, but are pertinent because of their discussion of the principles of Maryland law which apply in a case involving the master-servant relationship.

13. *Huff v. Marine Tank & Testing Corp.*, 631 F.2d 1140 (4th Cir. 1980), was a compensation case in which the special employer avoided tort liability by successfully arguing that the plaintiff was its borrowed servant. Applying federal law, the Fourth Circuit found that the general employer had there functioned in a manner comparable to Manpower, Inc. in supplying temporary help, and relied upon decisions holding that such a firm was not the primary employer of one injured in the performance of a temporary job.

144 A. 510 (1928). There, the owner of a quarry purchased dynamite from a powder company. An employee of the powder company came to the quarry to assist in the use of the dynamite. Through this employee's negligence, the quarry was damaged. In reversing a jury verdict for the quarry owner, the Court of Appeals held that because of the provisions of the contract between the parties, the special employer (the quarry owner) and not the general employer (the powder company) should be responsible for the employee's negligence. It is apparent from the opinion that absent the contractual provisions in question, the general employer would have been responsible for its employee's negligent acts. The *Hercules Powder Co.* case makes it clear that, under Maryland law, whatever the status of an employee under the "borrowed servant" doctrine, the parties may allocate between themselves the risk of any loss resulting from the employee's negligent acts.

█ What is also apparent from the Maryland cases is that the issue whether a master and servant relationship exists in any case is essentially a factual question which must be determined by the trier of fact where the evidence is conflicting. In *Keitz, Sacker* and *Snider*, directed verdicts and a judgment n. o. v. were set aside by the Court of Appeals, which concluded that the issue was one for the jury to decide. In *L. M. T. Steel Products, Dippel* and *Sun Cab*, jury verdicts were affirmed, the Court having concluded that there was sufficient conflicting evidence on the issue for the jury to make the determination. In *Ferris*, the factual determination made by a trial judge sitting without a jury was upheld. The Fourth Circuit, in *Malisfski v. Indemnity Insurance Co.*, 135 F.2d 910 (4th Cir. 1943), similarly upheld findings made by District Judge Coleman.

█ When the principles of the various Maryland decisions are applied to the facts of this case, this Court finds and concludes that Morris was not the borrowed servant of plaintiffs but rather that a master and servant relationship existed between Morris and the defendant General Ship. As disclosed by the evidence in the case, the intention of the parties was that Morris would remain the servant of defendant during the entire time that the contract was in existence. General Ship would retain the right to control and direct the actions of Morris while he worked at Sea Land's Terminal and would bear the risk of a loss like this one. Accordingly, General Ship must be held responsible for the negligent acts of Morris which caused the damage in question.

█ The ultimate question to be decided in this particular case is which of two business entities should bear the loss. To answer this question, the Court must examine the business relationship between the parties and in particular the intent of the parties concerning who should bear the risk of a loss like this one. First of all, it is significant that Morris was not "borrowed" but was in fact "rented." The Maryland cases have distinguished between loaned and hired servants, concluding that in a case involving a hired servant, it is much more likely that the employee in question continues to do the work of his general employer. *Dippel v. Juliano, supra*, 152 Md. at 700, 137 A. 514; *see* "The Borrowed Servant," 18 Md.L.Rev. 345, 347 n.14 (1958).

Next, in this case, the compensation arrangements between Sea Land and General Ship are particularly significant in revealing the intention of the parties. The billings to Sea Land were based on the number of hours that Morris worked at the Terminal. However, although Morris was paid at one rate, Sea Land was billed at a much higher rate. The question arises: what was Sea Land receiving from General Ship in return for this additional amount paid over and above the actual cost of Morris' services? The answer is that the parties must have contemplated that General Ship and not Sea Land would be charged with other necessary expenses involved in doing work of this sort, including the cost of liability and compensation insurance. In the *Keitz* case, the Court of Appeals ruled that in a case involving the applicability of the "borrowed servant" doctrine, evidence concern-

ing the liability insurance carried by the parties was relevant and could be presented to the jury. 214 Md. at 491, 134 A.2d 296.

This was not then a situation where the special employer was merely reimbursing the general employer for the salary paid to the employee. The amount charged by General Ship included an additional amount to cover other business costs and also presumably to permit a profit to General Ship for supplying the services in question. In the absence of a provision in the contract between the parties which shifted the risk of any loss resulting from the employee's negligence from General Ship to Sea Land, the compensation arrangements between the parties indicate the intention that General Ship, as the general employer, should bear the risk of loss. In the *Ferris* case, the Court of Special Appeals compared the compensation arrangements between the parties with the wages paid the employee in concluding that it had not been intended that the employee would be the borrowed servant of the special employer.

In the *Hercules Powder Co.* case, the Maryland Court of Appeals recognized (as do other jurisdictions) [14] that there is a presumption that the general employer is liable for acts of its employee absent a contractual provision or other circumstances shifting the risk of loss. Where maritime or harborworkers' activities are involved, contractual provisions expressly making an employee the "borrowed servant" of the special employer are well known and have been up-

held by this Court as protecting the general employer from liability for the employee's negligent acts. *Reederei Franz Hagen v. Diesel Tug RESOLUTE*, 400 F.Supp. 680, 685 (D.Md.1975).[15] Had General Ship wished to so protect itself, it could have insisted on a similar explicit provision in its contract with Sea Land.[16] In that event, Sea Land would have been responsible for the cost of protecting itself from a loss like this one, and the amount paid by Sea Land to General Ship under the contract would presumably have been adjusted accordingly. Absent such a contractual provision, the facts here disclose that the parties intended that General Ship would retain the right to control the actions of the employee, that General Ship would bear the risk of a loss like this one and that the employee would not be the borrowed servant of Sea Land.[17] General Ship thus must be held responsible for the negligent acts in question.

It is of little significance that Sea Land at some of its other world-wide terminals used its own personnel to perform maintenance and other services on its cranes located there. That fact has little relevance in determining whether Morris was under Maryland law the borrowed servant of Sea Land under this particular contract to be performed at this particular site. It is likewise not significant that Morris, after the contract between the parties was cancelled, went on the payroll of another independent contractor which provided these same serv-

14. *See, e.g., Dellums v. Powell*, 566 F.2d 216, 221 (D.C.Cir.1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3147, 57 L.Ed.2d 1161 (1978).

15. In the *Hagen* case, there was an explicit clause whereby the parties had agreed that the employee was the borrowed servant of the special employer. No such clause was found to be a part of the contract between the parties in *Tankers and Tramps Corp. v. Tugs JANE McALLISTER & MARGARET M. McALLISTER*, 358 F.2d 896 (2d Cir. 1966), *cert. denied*, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966), and the Second Circuit there held that in the absence of a contractual shifting of liability, the general employer was liable for the negligence of its employee which resulted in injury to the special employer.

16. On July 13, 1978, after the accident, General Ship submitted to Sea Land a proposed written agreement which contained explicit language making the crane maintenance electrician the borrowed servant of Sea Land. This proposed agreement was rejected by Sea Land, and subsequently, in November of 1978, the contract between the parties was terminated.

17. In *Borrowed Servants and the Theory of Enterprise Liability*, 76 Yale L.J. 807 (1967), it is suggested that as a general rule, the risk of loss should remain with the general employer, unless the employee is performing tasks outside the scope of the borrower's business or unless the general employer cannot pay. Application of that test to the facts here would also result in a finding that General Ship should be held responsible for Morris' negligent acts.

ices, and that subsequently Morris was hired directly by Sea Land. The relationships in question, arising after this accident, involved facts quite different from those pertaining to the contract between Sea Land and General Ship which was in existence between 1967 and 1978.

Defendant places particular emphasis on its contention that Morris, while he was working at the Sea Girt Terminal, was subject to direct supervision by Sea Land personnel. This argument does not distinguish between a general employer's right to control and supervise the actions of its employee and a special employer's needs which arise from day to day and which require the giving of instructions at the work site. The facts here disclose that Sea Land's Marine Manager at the Terminal did not supervise Morris in any detailed way. Morris brought his own tools, which were provided by General Ship. Morris needed no supervisor at the site since he himself was treated by General Ship as a supervisor. Morris was originally hired to do work as "Electrical SubContract." General Ship's time cards carried Morris as a "Supervisor." Workmen's compensation forms filled out by General Ship referred to Morris as an "Electrical Supervisor." [18] In arguing that General Ship's supervisory personnel had no right to direct and instruct Morris in his work, General Ship overlooks the fact that Morris was himself an expert electrician and was a supervisor in his own right. None of Sea Land's employees had the knowledge or expertise to supervise Morris in connection with his performance of the technical and electrical aspects of the services he rendered. Periodic inspections by Sea Land personnel, who came from Elizabeth, New Jersey, hardly amounted to continuing supervision and control by Sea Land of Morris' work.

Defendant points out that the services in question were rendered at Sea Land's Terminal rather than at General Ship's Yard. But this fact is of little importance. Just as General Ship's employees would have to board a ship anchored in the harbor to do ship repair work, they necessarily would have to travel to the Sea Girt Terminal to do repair and maintenance work on this large, land-based crane.

General Ship further argues that one may be a borrowed servant as to some duties performed but not as to others. Noting that any negligence of Morris was the result of his failure to tie down the crane, defendant asserts that it was in no position to control and supervise the tie-down work of Morris and that as to those particular activities, Morris was the borrowed servant of Sea Land. But no such fragmentation of the "borrowed servant" doctrine has been recognized by the Maryland cases. Work done preparatory to or after the performance of skilled services is hardly so different in kind as to alter the master-servant relationship which exists between an employee and a general employer. Defendant also suggests that it was not a part of the agreement between the parties that its personnel would tie down the crane after its use. The evidence supports no such contention. Morris clearly understood that his duties included untying the crane before cargo operations, moving it into position for the loading and unloading of container vessels, and taking the crane back to its tiedown position and securing it after the cargo operations had been completed. This was the long-standing practice, and was accepted by both parties as a part of the existing contract.

For these reasons, this Court finds and concludes that General Ship is legally responsible for the negligent acts of its employee Morris.

## V

### The "red letter clause" defense

As a further defense, General Ship asserts that a clause which was a part of the contract between the parties exculpates it

---

**18.** Initially, two men were supplied by General Ship to perform the work in question. This was later changed by mutual agreement, and Morris alone did the work in question. One of the reasons for this was that Morris was himself a supervisor.

from any liability.[19] By way of reply, plaintiffs contend first, that the clause in question was not a part of the agreement between the parties and secondly, that in any event, exculpatory clauses of this sort are invalid as contrary to public policy. *See Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955). It is not necessary to decide whether or not the exculpatory clause relied upon in this case is invalid as contrary to public policy. The language of the clause itself and other facts here indicate that these provisions were not a part of the agreement between the parties and are therefore not controlling.

As noted herein, the contract between the parties was partly written and partly oral. Defendant concedes that between 1967 and September 1974, no exculpatory provisions were a part of the contract. Beginning in the fall of 1974, defendant included on its letterheads and billheads, in small print, the following language:

In consideration of the repairs or replacements herein provided for being undertaken by us, it is agreed as follows:

Work will be performed by us only upon the following terms and conditions, which shall be deemed to have been accepted by the Customer upon the arrival of the vessel at our yard or upon commencement of the work by us at any other location:

We shall not be liable for any damages or delays caused by strikes, labor difficulties or disturbances, fire, accidents of any nature, with or without negligence on our part, except as hereinafter provided, Acts of God, restraints of Government, delays in delivery of materials, or any other causes. We will correct at our expense any workmanship or material proven to be defective due to our default provided that notice of same be received by us in writing within thirty days after the departure of the vessel from our yard or the completion of the work by us at any other location. In the absence of said notice within the time specified, it shall be conclusively presumed that the workmanship and materials furnished were free from any defect or deficiencies whatsoever. Customer agrees that our liability for defective workmanship or material shall be limited solely to the cost of repair or replacement of the defective part and that we shall have no liability of any nature whatsoever for damages directly or indirectly caused by such defective workmanship or material, whether for loss of or injury to persons or property, including a vessel, its cargo, equipment or stores, and the Customer hereby agrees to protect and save us harmless from all claims or actions asserted or instituted against us by any third party.

Should any provision of this contract exempting us from liability be declared or adjudged to be invalid, the customer agrees that [in] no event shall our aggregate liability to all parties whether the customer or others exceed the sum of $300,000.00 with respect to or arising out of repairs or replacements to any one vessel and in event of claim, suit or other action by third parties, customer agrees to hold us harmless for any amount above this sum, including if necessary, payment of said excess amount to said third parties.

Bills are payable when rendered and we shall have a lien upon the vessel for our charges, and, after thirty days, a charge of 1½% per month shall be added to all unpaid bills.

Any provisions in the Customer's invitation to bid, specifications, or instructions which seek to vary the foregoing in any respect will not be accepted.

We are willing to accept vessels on the basis of different or more extensive liabilities than those stated above, but only if a special written agreement shall be entered into before the arrival of the vessel at our yard or before commencement of the work by us at any other location declaring the value of the vessel, its contents and appurtenances, providing

---

19. Provisions of this sort are known in the industry as "red letter clauses." *See Todd*

*Shipyards Corporation v. Turbine Service, Inc.*, 467 F.Supp. 1257, 1297–99 (E.D.La.1978).

for payment to us, in addition to our normal charges, of the cost of additional insurance to cover such different or more extensive liabilities.

Defendant contends that these provisions became a part of the agreement between the parties and protect General Ship from liability arising as a result of the negligence of its employee. This Court would disagree.

The language on its face indicates that the clause was intended to apply to ship repair work done at General Ship's Yard and elsewhere and not to work of the sort done by General Ship for Sea Land. The word "vessel" is used throughout.[20] Language in the fourth paragraph (which limits liability to $300,000 in the event other provisions are adjudged invalid) indicates the provisions in question are intended to apply to "repairs or replacements to any one vessel * * *" General Ship is to have "a lien upon the vessel" for its charges. Nowhere is there any language to suggest that these provisions apply to work on land or to a land-based crane, much less to the maintenance and stand-by work performed under this particular contract.

There was no need for Sea Land to specifically disallow these provisions when they suddenly appeared on General Ship's bills and correspondence for the first time in the fall of 1974. A mere reading of the language in question would indicate that it did not fit the work being performed by General Ship for Sea Land but was intended to cover only ship repair work.

■ The clause in question was drafted by General Ship and must be strictly construed against it. 6A *Corbin on Contracts* § 1472 (1962). Particularly where a party is seeking exculpation from liability for its own negligence, the immunity in question "can arise only from the plainly expressed intention of the parties, manifested by language couched in unmistakable terms." *Lanasse v. Travelers Insurance Co.*, 450 F.2d 580, 584 (5th Cir. 1971), *cert.*

*denied*, 406 U.S. 921, 92 S.Ct. 1779, 32 L.Ed.2d 120 (1972); *Hudson Waterways Corp. v. Coastal Marine Service, Inc.*, 436 F.Supp. 597, 605 (E.D.Tex.1977). Not only does the language relied upon not plainly express any intention of the parties that it apply to this contract, but also a fair reading indicates that the clause was designed solely for ship repair work.

By 1974, the contract between the parties had been in existence for some seven years. To succeed in establishing that the terms of the agreement were drastically changed after so many years, defendant would have to show some affirmative act on the part of Sea Land accepting the new terms of the agreement. No such evidence exists in this case. It is therefore apparent that no agreement was ever reached that the terms of the existing contract would be changed to include the provisions of this "red letter clause."

On the record here, this Court finds and concludes that the parties did not intend that the clause relied upon would become a part of the agreement between the parties. Accordingly, defendant cannot in this case rely on this "red letter clause" to avoid liability for the negligence of its employee.

## VI

*Contributory negligence and assumption of risk*

■ Finally, defendant argues that Sea Land is barred under Maryland law from any recovery in this case because Sea Land itself was contributorily negligent or assumed the risk of this particular casualty. These defenses will likewise be rejected. On the record here, this Court finds and concludes that Sea Land and its representatives were not contributorily negligent in acting or failing to act in the manner claimed to protect the crane from a loss of this sort, that they did not assume the risk of a casualty of this sort and that whether or not defendant has proved contributory

---

**20.** The word "vessel" or "vessels" appears in the second, third, fourth, fifth and seventh paragraphs of the clause. The third paragraph refers to "cargo, equipment or stores" of a vessel. Nowhere does the word "crane" appear.

negligence or assumption of risk in this case, the acts and omissions relied upon were not a proximate cause of this accident.

General Ship argues that Sea Land should have adopted a sophisticated weather warning system to protect itself from casualties of this sort and that had Sea Land done so, the accident would never have occurred. It is asserted that there was no wind-warning service to the Terminal by teletype connection to the National Weather Service or by VHF radio or by commercial weather service. General Ship further relies on the fact that Sea Land adopted no corrective measures as a result of wind damage to cranes located at the Dundalk Marine Terminal of the Maryland Port Administration (hereinafter "MPA"), occurring two years earlier on March 21, 1976. *See Maryland Port Administration v. SS AMERICAN LEGEND, supra.* It is argued that Sea Land should have reviewed MPA's files containing reports of governmental investigations and should have adopted further safety procedures to avoid wind damage to its crane of this sort occurring during a thunderstorm.

Under the facts of this case, the failure of Sea Land to adopt these sophisticated back-up procedures did not amount to a lack of due care. Whatever the result under other circumstances, the procedures in effect at the Sea Girt Terminal at the time were entirely adequate to prevent this casualty, absent negligence on the part of Morris, who was the individual responsible for doing what was necessary. The gusting thunderstorm winds which blew the crane down the pier on June 27, 1978 were not of hurricane force, reaching maximum speeds of some 49 to 54 miles per hour. Had merely the rail clamps themselves been cranked down, the crane would not have been moved by winds of this velocity. Moreover, even more secure tie-down arrangements were available, including the pins and turnbuckles located at the crane's normal tie-down position. Use of any of these devices would have avoided the accident.

■ Defendant relies on the fact that evidence of the destruction of MPA cranes in the windstorm which occurred on March 21, 1976 should have indicated to Sea Land that more sophisticated procedures were necessary to protect its crane from a similar accident. But it is undisputed that Sea Land's crane was not damaged at all in March of 1976 when very high winds destroyed two MPA cranes and damaged two others, all four of which were located merely one mile away from the Sea Girt Terminal.[21] The tie-down procedures available at the Sea Girt Terminal had adequately protected Sea Land's crane on that earlier occasion. Thus, there was no reason to adopt new measures since the old ones had proven to be quite adequate in providing the necessary protection. Since 1967, Sea Land had relied on Morris to do what was necessary to secure this crane when his maintenance and other work was finished. Such reliance was entirely reasonable on June 27, 1978, as it had been on all earlier occasions when high winds had passed through the area. An injured party can hardly be found guilty of either contributory negligence or assumption of risk because it did not take steps to protect itself from the unexpected negligence of another's employee. Under neither doctrine is a plaintiff required to anticipate that it will suffer loss arising from negligence which it had no reason to foresee. *People's Drug Stores, Inc. v. Windham*, 178 Md. 172, 186, 12 A.2d 532 (1940).

■ Furthermore, defendant has not proved that any acts or omissions of Sea Land or its representatives were the proximate cause of the accident. The sole proximate cause of this loss was Morris' negligence. But for his acts and omissions, the accident would not have occurred. A party with the burden of establishing that certain conduct was the proximate cause of an occurrence does not satisfy that burden by showing a mere possibility of such causation. *Robin Express Transfer, Inc. v. Can-*

---

**21.** The record in the *Maryland Port Administration* case indicates that the winds involved there were of a much higher velocity than the winds in this case.

*ton Railroad Company,* 26 Md.App. 321, 334–35, 338 A.2d 335 (1975).

For these reasons, this Court concludes that the defenses of contributory negligence and assumption of risk do not bar a recovery by plaintiffs in this case.

## VII

### *Damages*

The parties have stipulated that the total pecuniary loss suffered by plaintiffs amounted to $313,083.97. This figure includes damage to the crane and crane stops, as well as additional operating costs incurred by plaintiffs during the time the crane could not be used. It has further been stipulated that the costs and expenses paid by Sea Land were paid or incurred as of September 30, 1978.

Plaintiffs are therefore entitled to judgment in the amount of $313,083.97, together with interest from September 30, 1978 to the date the judgment is entered. Maryland law recognizes that prejudgment interest is appropriate in a case of this sort. *Pine Street Trading Corp. v. Farrell Lines, Inc.,* 278 Md. 363, 377, 364 A.2d 1103 (1976). Interest at the rate of 10 percent per annum will be allowed in this case. *See* Md. Ann.Code, Cts. and Jud.Proc., § 11–107 (1981 Supp.).

## VIII

### *Conclusion*

For the reasons stated, plaintiffs are entitled to judgment in this case in the amount of $313,083.97, plus interest at 10% from September 30, 1978 to the date of this judgment, and costs. The Clerk is directed to enter judgment accordingly.